[See Case No. 8,667.]

---

McCAFFREY (SKINNER v.). See Case No. 12,924.

---

## Case No. 8,669.

### McCALL'S CASE.

[20 Leg. Int. 108, 292; 5 Phila. 259.]

District Court, E. D. Pennsylvania. March 27, 1863.

HABEAS CORPUS—MILITARY DRAFT—PERSONS LIABLE THERETO—MILITIAMEN—MISNOMER—AGE.

1. When persons who are to render military service have been ascertained by draft or otherwise, and have been lawfully commanded to attend a rendezvous, those who disobey may be subjected by military force to military discipline and organization, where legislation has not substituted a different rule.

2. Where a militiaman of a state, duly called under the act of congress of July 17, 1862, c. 201 [12 Stat. 597], into the military services of the United States, has disobeyed an order to attend at a rendezvous, his subjection to military discipline and organization is compellable by military force.

3. Militiamen of the states who are liable to be called into the service of the United States through enrolment and draft cannot be lawfully drafted unless their names have previously been accurately enrolled. A misnomer in the enrolment prevents the person misnamed from being liable to the draft.

4. Legislation of the United States, both of 1792 [1 Stat. 264] and 1862 [supra], requiring the enrolment in the militia of the states, of all citizens between the ages of eighteen and forty-five years, but intervening legislation of Pennsylvania requiring the enrolment in her militia of only persons between the ages of twenty-one and forty-five years, quaere, whether, in Pennsylvania a draft of militiamen, under a call from the government of the United States, made from an enrolment which omits the names of persons between the ages of eighteen and twenty-one years, is binding upon the persons drafted.

[This was a hearing upon the return of a writ of habeas corpus sued out by Cornelius McCall.]

CADWALADER, District Judge. The petitioner was arrested at his residence in Montgomery county, Pennsylvania, by military officers of the United States, as a deserter from the military service into which he had, as they allege, been drafted, under the act of July 17, 1862. The allegation is that he disobeyed the order to attend at the county-seat within five days of the time of drafting. The arrest was made under the supposed authority of the act of congress of March 3, 1863 [12 Stat. 731], for enrolling and calling out the national forces, and for other purposes. The 13th section of this law enacts that a person drafted under it, failing to report at the place of rendezvous without furnishing a substitute, or paying the authorized equivalent, shall be deemed a deserter, and shall be arrested and sent to the nearest military post for trial by court-martial, unless, upon proper showing that he is not liable to do military duty, the board of enrolment shall relieve him from the draft. The 7th section confers an authority to arrest all deserters, whether regulars, volunteers, militiamen or persons called into the service under this or any other act of congress, wherever they may be found, and send them to the nearest military commander or military post. This section, which is relied on as authorizing the arrest, cannot apply retrospectively to any person drafted under the former act, who was not already, in law, a deserter. The constitutional prohibition to pass an ex post facto law would prevent this. The section must therefore be understood as intended to apply only to such persons drafted under the former act as had been mustered into the service. But, though the officers were mistaken as to the authority under which they supposed that the arrest might be made, the party arrested should not be discharged, if, independently of the latter act of congress, he is subject, under the act July 17, 1862, to military detention, as a person compellable to render military service.

When the inhabitants of a country who are liable to be called into military service have been enrolled, and such of them as are to render the service have been ascertained by draft, and the persons thus drafted have been lawfully required to attend at an appointed time and place of muster, those who disobey are amenable to military discipline and military organization, unless the subject has been otherwise legislatively regulated. Where the government whose authority they have set at naught may by military force compel their subjection to such discipline and organization,—the system is a conscription. But where, though their offence is cognizable by a military

tribunal, their disobedience is punishable only by a certain pecuniary or other penalty, and they cannot be further subjected to military discipline or detention, the system is not a conscription, as the word is now ordinarily understood. Judge Washington said, that under a system of the latter kind, a fine to be paid by the delinquent is deemed an equivalent for his service, and an atonement for his disobedience. [Houston v. Moore] 5 Wheat. [18 U. S.] 20, 21. Under a system of the former kind, the conscript who fails to attend the muster is not a "deserter," unless this word has been made specially applicable to his case by legislation. But his disobedience is a military offence. It is not the less of this character, because it may not be within the ordinary meaning of "desertion," or may be of a less aggravated grade. He is liable not only to military arrest and military compulsion or punishment, but also to ulterior military detention.

The constitution of the United States authorizes congress to raise armies, and also to call forth and organize the militia of the several states. Under this twofold power, both regular national armies, and occasional militia forces from the several states, may be raised, either by conscription or in other modes. [Houston v. Moore] 5 Wheat. [18 U. S.] 17. The power to raise them by conscription may, at a crisis of extreme exigency, be indispensable to national security.

Until after the end of the first year of the present war, no such crisis had ever, in the opinion of congress, occurred in the United States. Regular armies had been raised altogether by voluntary enlistment. Successive acts of congress had authorized occasional calls by the president upon the several states for the services of militiamen for limited periods. Under the acts of 1792 [supra] and 1795 [1 Stat. 424], the militia of the states, when thus called forth, might have been retained in service until the expiration of thirty days after the next session of congress; but no militia man was compellable to serve more than three months in any one year. These two limitations of time were repealed by the act of July 29, 1861 [12 Stat. 281]. The only limitation substituted by it was that the service should not continue beyond sixty days after the commencement of the next session of congress, unless a further continuance should be expressly provided for by law. Judges of the supreme court who differed on some other points, all concurred in the opinion that congress, in framing such acts, might lawfully have designated both the officer and private who should serve, and have called him into service with a complete military subjection to the national government, commencing at the time of such designation, or at that of a draft, or at that of an order to attend a muster, as distinguished from that of reaching the place of muster. [Hous-

ton v. Moore] 5 Wheat. [18 U. S.] 36, 37, 16, 17, 18, 20, 56, 64. But, as the laws of 1792 and 1795, and July, 1861, were framed, this military subjection of a drafted militia man did not begin till he was mustered into the national military service. His previous military relation only required that, if he disobeyed the order to attend the muster, he should submit to the imposition of a limited pecuniary penalty, with a limited imprisonment for non-payment, and a liability in the case of an officer to be cashiered and temporarily incapacitated from holding a commission. These penalties were to be adjudged by a court martial. That this was the mode of trial shows that the offence of disobedience to attend the muster was of military cognizance. But no department, or officer of the government or the United States, could, under these laws, compel a drafted militia man to be mustered into the service or to attend a place of muster, or to undergo punishment beyond the prescribed penalties, or to submit to ulterior military detention. Another act of congress of the year of 1792, which continued in force, had prescribed the enrolment of every free able-bodied white male citizen between the ages of eighteen and forty-five years, in the militia of the several states. But the drafting, and procuring the attendance of drafted men to be mustered in, had, except in the imposition of these limited penalties, been left by congress to the legislation of the states. The act of congress of July 17, 1862, indicates, however, that the former system of legislation was thought inadequate for the exigencies of a second year of the present war. Several hundred thousand volunteer militiamen had, in the interval, been received into the national service. But a prompt reinforcement of at least three hundred thousand men for a service of nine months was thought necessary.

The defects of the former system for such a crisis were, that the enrolments of the militia in some states had been omitted, and in others had not been regularly or uniformly made, so as to prepare proper lists for drafting; and that there was no law of the United States to compel by military force the mustering of those who might be drafted. The laws of the states authorized no such compulsion. They had been framed by men averse to the system of conscription, who never anticipated such a necessity for its adoption as had unfortunately occurred. The act of July, 1862, was intended to meet the exigencies of this crisis, and also to provide for cases of like exigency in time to come. The first section enacts, that whenever the president shall call the militia of the states into the service of the United States, he may specify the period, not exceeding nine months, for which their services will be required; "and the militia so called shall be mustered in, and continue to serve for and during the term so

specified, unless sooner discharged by command of the president. If, by reason of defects in existing laws, or in the execution of them, in the several states, or any of them, it shall be found necessary to provide for enrolling the militia, and otherwise putting this act into execution, the president is authorized in such cases to make all necessary rules and regulations." The provision of the act of May 8, 1792, for the enrolment in the militia of citizens between the ages of eighteen and forty-five was re-enacted in a modified form. On 4th August, 1862, the president, through the war department, issued a call for an immediate draft of 300,-000 men from the militia of the several states for a service of nine months unless sooner discharged; and ordered the secretary of war to assign the quotas to the respective states, and establish regulations for the draft. The secretary of war, accordingly, designated the quotas of the states in communications of August 9, 1862, to the respective governors; and by general orders of August 9 and 14, 1862, established administrative regulations for the enrolment and draft, and for an apportionment of the quotas among counties, &c., so that allowances should be made locally for volunteers previously furnished. Under these orders the respective governors were to cause the necessary enrolments to be made in the several counties of all able bodied male citizens between the ages of eighteen and forty-five years; and were to appoint a commissioner to superintend the draft in every county of states in which no provision had been made by law for carrying it into effect, or existing provisions were, in any manner, defective. Regulations for making the enrolment and draft in such cases were prescribed in detail. The respective governors were requested to designate, in the meantime, places of rendezvous in the several states. Written or printed notices were to be served on the persons drafted, who were ordered to assemble within five days at the respective county seats, whence transportation to the place of rendezvous would be furnished. The governor of Pennsylvania carried these directions and requests into execution through commissioners to superintend the draft for their respective counties, &c. In Montgomery county the notices to those drafted, served in October, 1862, informed them that they had been drafted into the military service of the United States, and required them to attend at the rendezvous at the court house in Norristown within five days after service of the notice.

The act of July 17, 1862, does not contain the word conscription; nor is this word in the subsequent act of March 3, 1863. The latter act has established, nevertheless, a system of raising and recruiting for the present war, independently of the states, a regular national army by conscription. The exercise of the powers of compulsory draft-ing conferred by this law may, possibly, prevent future calls, during the war, upon the states, for bodies of their militia to be obtained for the national service by such drafting. Though this may be not only possible, but probable, the act has not repealed that of July 17, 1862, or necessarily superseded its execution, or substituted—as to the militia of the states—any other system. For the purposes of the present case, the effect of the act of July, 1862, therefore, is precisely the same as if no subsequent law had been passed. The effect of the act of July, 1862, has been, I think, to establish a system for obtaining, from time to time, upon the call of the president, as occasion may require, bodies of militia from the several states by conscription; that is to say, by draft, with a right of compelling the attendance of the men drafted.

In stating the reasons of this opinion, I will, in order to follow the course of the argument, consider first the intended effect of the act, and afterwards the question whether the legislative intention can take effect.

It has been argued that the sole purpose of the act was to obtain militiamen for nine months, instead of the former term of service. For this purpose, however, if no further change of system was intended, a few simple words would have sufficed. These words are contained in the act. But other words which are contained in it would not have been added if another important change of system had not been intended. In another part of the act an altogether distinct provision is made for accepting volunteers if offered for this period of nine months. The intended change of system was therefore as to militiamen to be drafted for the new term of service.

Another argument is, that the object of the act is only to remedy defects and establish uniformity in the enrolment of the militia, and that when this purpose has been effected, the subsequent draft and its consequences are left to the unchanged operation of the former system. The act, however, enables the president, if either the state laws, or their execution, should be defective, to make regulations "for enroling the militia, and otherwise putting this act into execution." The purposes of the act extended, therefore, beyond the mere enrolment. What were these ulterior purposes? The answer is, that they were to provide for a draft, and for one that should be effectual.

The drafting would not have been effectual without a power to compel the attendance of those drafted at a rendezvous or place of muster. Under the former system, their attendance at such a place could not be enforced. The intended change of system was that it should be enforceable. The law, therefore, expressly enacts that the militia called forth "shall be mustered in." It is true that these words are contained in a

clause of the act which designates the term of service. It is argued, but I think inconsequentially, that they have, therefore, no other effect than to fix the period of mustering as that from which the computation of the time of service is to begin. This certainly is not the phraseology; and I think that it is not the intended effect. The act of May 2, 1792, had provided that no militiamen should be compelled to serve more than three months in any one year; and the act of February 28, 1795, that none should be compelled to serve more than three months after his arrival at the place of rendezvous in any one year. The clause in question, after authorizing the president to specify in his call the period of service required, not exceeding nine months, enacts that the militia so called shall be mustered in, and continue to serve for the term specified, unless sooner discharged. If the former system had been continued, the enactment would, according to the former phraseology, have made the time computable from the period of their being mustered in, or from that of their arrival at the place of rendezvous. But in that case, the form of expression "shall be mustered in" would have been avoided. Its adoption, in view of the course of reasoning of the supreme court in [Houston v. Moore] 5 Wheat. [18 U. S.] 20, 21, upon the acts of 1792 and 1795, cannot be regarded as immaterial, or as having been unintentional. The purpose of the act of July, 1862, must, therefore, have been that the men drafted under it should be compellable to serve. The words have this, and no other, fair import.

It is objected in argument, that for the delinquency of not attending, under this act, at the place of muster, the same penalties which were imposed under the former acts may still be inflicted. This being assumed, the argument is that as the act does not expressly subject the delinquents to any other military restraint or discipline, none can be imposed by implication. Assuming for the present that the same specific penalties might, under the former laws, or one of them, be inflicted upon delinquents under the act of July, 1862, the answer to the objection would be, that such a liability to specific military penalties is not in itself inconsistent with an ulterior continuance of subjection to military discipline and military restraint. Therefore, though the same penalties were still specifically enforceable, the consequence that military subjection under the latter act must cease upon their infliction would not follow. The main question under this act is not one of implication. The question is, whether its words do not establish, from the time of notice of the draft, a military relation of which ulterior as well as immediate subjection to military discipline and restraint is a lawful incident. This question has already been considered. If the words have rightly been so understood

that due effect cannot be given to them unless the existence of such a military relation is recognized, the objection could not prevail, though its premises were correctly assumed.

But the question is resolvable more simply if the specific penalties of the former acts are to be considered as applicable only to militiamen called upon for service in the mode and for the respective periods prescribed by those acts. If this be so, the immediate subjection of persons drafted under the act now in question to general military law, including their liability to compulsory military restraint and organization, is the only means of enforcing the act than can have been intended by congress. Now, in every one of the three former acts, the section imposing these penalties is repeated, with no change of expression which can here be regarded as material; but it is not re-enacted by the law in question. Moreover, in every one of the former acts, it follows the sections which prescribe the mode of calling the militia forth, and the term of their service, and, in every one of them, is expressed in words of enactment, "that every officer, non-commissioned officer, or private of the militia who shall fail to obey the orders of the president in any of the cases before recited shall forfeit," &c. Independently of differences in the modes of calling into service, the difference in the term of service under the act in question takes the case out of the definition of a case recited in any of the former acts. The only former act in force on this point was that of July of the year preceding the act in question. Both acts, that of July, 1861, and that of July, 1862, are now in force. No man called under the system of the former act into service, after the first week of June in any year, can be required to serve as long as nine months unless an act of congress passed within sixty days after the commencement of the session should prolong his term of service; and the term is shortened as its commencement approaches the commencement of a session of congress. Under the act in question, the term of service, if so defined in the call of the president, is nine months. This case had not been mentioned in the act of 1861, or in any prior act. It is difficult to conceive that congress would, in 1862, have omitted to re-enact the former provision concerning penalties, as was done in 1861, if the purpose of the system was in this respect unchanged.

Here, however, it is objected that, under the system of conscription for the regular army, prescribed by the subsequent act of March 3, 1863, a person drafted may obtain exemption from the military service, either by furnishing an acceptable substitute, or through a pecuniary commutation for one,— the amount not exceeding a certain uniform sum, to be designated by the secretary of war. The argument is that this indicates a continuance of the system of pecuniary equivalents established under the laws prior

to the act of July, 1862, which act should therefore be so interpreted as to maintain, in this respect, a conformity in the entire system of legislation. If this assumed conformity of the act of March, 1863, and the laws prior to the act of July, 1862, could be established, the argument would not have any force unless the words of the act of 1862 were doubtful or obscure. But the supposed conformity does not exist. Under the act of July, 1862, the administrative details of the draft were so regulated by the president, through the war department, that a person drafted might obtain an exemption by offering an acceptable substitute. Such an executive regulation was properly made under the express authority conferred by the act. But, without further legislative authorization, a pecuniary commutation could not have been substituted by the executive organ of the government. Such commutation, unless for the purpose of obtaining with the money a proper person to serve as a substitute, would have been foreign to the purposes of the act of 1862; and that act does not authorize a receipt of commutation money to be used by the executive department as a bounty fund for enlistment. Such a receipt and application of such money through the war department is precisely what the subsequent conscription law for the regular army has authorized by the provision relied on in the argument. The enactment is that any person drafted and notified may furnish an acceptable substitute, or pay "such sum, not exceeding three hundred dollars, as the secretary may determine, for the procuration of such substitute, which sum shall be fixed at a uniform rate by a general order made at the time of ordering a draft, for any state or territory." Thus the rate may vary in different states or territories, with local differences in the bounty money that will obtain a substitute. The commutation money must be fixed by the secretary of war, at an amount sufficiently great to enable him to procure with it a recruit. When paid, it does not, like the penalties under the former system, pass into the treasury; but becomes a fund at the disposal of the war department, not for its general expenses, but for the specifically defined purpose of procuring a substitute for the exempt. The money is neither a penalty for non-attendance, nor an arbitrary equivalent for the military service originally due, but such an absolute equivalent for a military substitute as will afford the sure means of obtaining one in place of the exempt.

The subject of the act of March 3, 1863, is more simple than that of the act of July 17, 1862, which is complicated with relations to the states, and the operation of their existing militia systems. The act of 1862, was passed on a sudden and unexpected emergency. The system of regulations to carry it into effect must have been hastily, and may have been crudely, organized. The system under the act of March 3, 1863, is more matured in its details than any system which could have been organized for the militia under the executive regulations organized by the former act. The interpretation of this former act should not, however, be influenced by the obvious magnitude of the difficulties in carrying the executive regulations under it into effect. Nor should a retrospective effect be given to the subsequent law by comparisons of these regulations with its enactments. The subjects of the two laws are different. Their operation may be, in some respects alike, in others different.

The legislative intention having been ascertained, the remaining inquiry is, whether it can take effect. The counsel for the petitioner contend, that the constitution did not authorize the delegation by congress to the president of the authority to make regulations on the subjects of the act of July 17, 1862; and also that, if the authority was constitutionally conferred upon him, he exceeded it in subdelegating its exercise to the secretary of war. They also contend that there was no authority for the ulterior delegation of powers to the governor of the state, and for his exercise of them through local commissioners, under the rules prescribed by the war department. In considering these points, the above order, in which they were argued, will be inverted. As to whatever may concern existing or expectant relations of militia of a state to the general government, the governor of the state, as her chief executive magistrate and as the commander-in-chief of the militia, may, except under extraordinary circumstances, be properly communicated with by the president through the war department. This is peculiarly the case when bodies of the militia are to be called into the service of the United States. The president, in calling them forth, may address the orders directly to their immediate commanders. But the more proper course must almost always be to communicate his orders through the governor. Ordinarily, the former course had been to make known to him, through the war department, or otherwise, the force required, and leave to him the selection of the bodies of militia who should compose it. The president, having addressed an order to the governor, may, indeed, be unable to enforce the observance of it compulsorily against him, unless he is actually in the field as commander of the militia of the state. [Houston v. Moore] 5 Wheat. [18 U. S.] 15, 16, 17, 37–43, 46; also [Kentucky v. Dennison] 24 How. [65 U. S.] 107. The president must, in such a case, act as the occasion may require, without the intervention of the governor. In the present case nothing of the kind occurred in Pennsylvania. The authority vested in the president by the act of congress to make such regulations as defects in state laws, or in their execution, might render necessary to carry the purposes of the act into effect, could not have

been conveniently exercised independently of the governors of the respective states. The requirements of the president, through the war department, were such as the governors were the most proper officials to execute. They may not have been compellable to execute such requirements, to execute through local commissioners, or in any other specified mode. But, if the governor of a state, in compliance with such requirements, whether communicated in the form of orders, or in any other form, saw fit thus to co-operate in executing the purposes of the act, his intervention was lawful; and nothing could be more proper.

As to the intervention of the secretary of war, if the president had the power to prescribe administrative regulations, this power was exercisable by him through the proper executive organ of the government, which was, in this case, the war department. The head of this department was a proper officer for organizing the draft, so far as the authority of the president extended, and also for making the regulations of the draft public. When they were made known through the secretary of war, they were, therefore, to be considered as acts of the president.

The proper inquiry, therefore, is whether they were such regulations as congress could authorize the president to make. Regulations of some kind were necessary. The details of a compulsory draft could not be simple; and there was no practical experience of such a system. Of course, congress cannot constitutionally delegate to the president legislative powers. But it may in conferring powers constitutionally exercisable by him, prescribe, or omit prescribing, special rules of their administration; or may specially authorize him to make the rules. When congress neither prescribes them, nor expressly authorizes him to make them, he has the authority inherent in the powers conferred, of making regulations necessarily incidental to their exercise, and of choosing between legitimate alternative modes of their exercise. Whether his authority extends farther, and enables him, without express authority from congress, to make regulations which, though incidental, are not necessarily so, is a different question. When, however, congress, in conferring a power, which it may constitutionally vest in him, not only omits to prescribe regulations of its exercise, but, as in the present case, expressly authorizes him to make them, he may, within the limits of, and consistently with, the legislative purpose declared, make any such regulations incidental, though not necessarily so, to the power conferred, as congress might have specially prescribed.

In 1812, congress, in declaring war against Great Britain, authorized the president to issue letters of marque and reprisal; and a few days afterwards, authorized him to revoke any such as he might afterwards grant, and to establish and order suitable instructions for the better governing and directing the conduct of the vessels so commissioned, their officers and crews. The president thereupon issued such "instructions to private armed vessels" as, independently of this authorization by congress, might, perhaps, have proceeded from him as the constitutional commander-in-chief of the navy. But he issued a second instruction to privateers when information was received that Great Britain had, after the declaration of war, but before knowledge of it, repealed her orders in council; and that, under a belief that the repeal would induce a suspension of hostilities by the United States, large shipments of merchandize had been made from England for this country. Vessels belonging to citizens of the United States, laden with such merchandize, were liable to capture and condemnation for being engaged in trade with enemies. The second instruction prohibited the capture of such vessels as had thus been laden with British merchandise, in consequence of the repeal of the orders in council. The constitution had conferred upon congress, and not upon the president, the power to make rules concerning captures. The question arose, whether such a capture as the president had thus prohibited was made unlawful by his prohibition. The argument for the validity of the capture was, that the authority to give instructions to privateers conferred by congress on the president had been intended only to enable him to regulate the conduct, and prevent the misconduct of privateersmen, and not to limit or diminish their rights of capture, much less to impair the belligerent right of their nation to confiscate captured property of her citizens embarked in trade with her enemies. The president, as commander-in-chief, might regulate the conduct of the captors, but it was contended that he could not, by an executive act, declare what should be lawfully a subject of capture, because this would encroach upon the constitutional power of congress to make rules on that subject. The supreme court thought that the question of the president's authority as commander-in-chief to issue such instructions would have deserved grave consideration, if the decision of it had been required, but that no such decision was necessary, because, under the act of congress, he "had full authority to issue the instruction." [The Thomas Gibbons] 8 Cranch [12 U. S.] 427, 428. The citation of congressional and judicial precedents which sustain legislative grants of authority to make administrative regulations, general and in detail, and to carry them into effect, might be multiplied almost beyond measure. The rules prescribed through the war department under the authority of the act in question did not exceed the proper limits of administrative regulation of their subject.

The petition in this case was for a writ of habeas corpus, to be addressed to persons described as military officers; and alleged in

general words, an illegal restraint by them of the petitioner under a pretended authority of the United States, or of the president. When the petition was presented at chambers, in the afternoon of 24th instant, I doubted the propriety of sanctioning a proceeding in such a form as might enable any soldier under military arrest—or any civilian arrested under military authority when within the lines of a camp, or other place in actual military occupation—to demand, as of course, a writ of habeas corpus to be addressed to any military custodian. The authority of courts of the United States to issue writs of habeas corpus is more limited than that of the state courts; and I am not in the habit of granting the writ in any case without sufficient reason to believe that it may be a case proper for the exercise of the jurisdiction.

I suggested to the counsel of this petitioner that, in the absence of an averment or affidavit that he was not a person in military service, and with no statement of any specific reason for issuing the writ if he was in such service, I would hesitate to grant the writ, unless the case were one in which delay might be injurious. I said that, if it were such a case, I would not regard any defect of mere form, but would issue the writ at once upon the present application, and the statement by counsel of any reason for issuing it that might have been specified in the petition or affidavit. The counsel then stated the case as it has been above detailed; adding that the petitioner had been drafted under a wrong Christian name, and that it was believed that unless the writ were issued, he would be removed from the district early on the next morning. I thought the misnomer, without a denial of the identity of the party, immaterial, but said that an argument might change this impression. As to the other points, my impressions were then such as have already been stated in this opinion. I said to the counsel, that if the probability of the petitioner's early removal had not been mentioned, I would not have issued the writ without first hearing an argument after notice to the law officer of the United States for the district. But, as the removal of the property was apprehended, I would, in a case where personal liberty was in question, grant the writ at once.

These proceedings at chambers have been mentioned in order that the course of practice, in ascertaining whether a habeas corpus can properly issue under the limited statutory jurisdiction of the court, may be understood. Whether a man is lawfully in military service must always be a judicial question. It is peculiarly a question for decision under a habeas corpus. Upon this decision the applicability or inapplicability of military law depends. But even where the principal inquiry is whether military service is due to the United States, important questions more proper for decision by a state court than by a court of the United States may sometimes arise, either incidentally or consequentially.

On the hearing in court it has appeared that the misnomer was not only in the draft, or notice of it, but also in the previous enrolment. This presents a question different from that which was stated at chambers. A partial misnomer in a draft made from a proper enrolment may perhaps be immaterial if the identity of the party is unquestionable. But, without an accurate enrolment, there can be no valid draft. An enrolment which is not an accurate list of names cannot be the proper material for a draft. The person drafted has not been in privity with the enrolment; but it has been the subject of proceedings by strangers to him; and through these proceedings the lot which falls upon him is cast. The supreme court of Massachusetts have decided that a misnomer in a militia enrolment renders it void as to the party misnamed. 3 Pick. 262. In the case in which this was decided, the mistake was of such a kind as perhaps would not, in some other states, have been thought a misnomer. [Keene v. Meade] 3 Pet. [28 U. S.] 5–7; 4 Watts, 329; 5 Johns. 84. See, however, 7 Watts & S. 406. But this rule of decision is not affected because it may, perhaps, have been thus misapplied in a particular case. In the present case the misnomer was unquestionably material. The party's Christian name is Cornelius. By some of his relations and friends, he is familiarly called Nele or Neely. He is of Irish descent, and by some of these persons this familiar name is pronounced Nale or Naly. He was enrolled as Naylor McCall. In consequence of the misnomer, he must be discharged from custody.

A point not mentioned in the argument is that, in Pennsylvania, the enrolment was of persons between the ages of twenty-one and forty-five years. Those between eighteen and twenty-one years of age were not enrolled. A question upon which I have, since the argument, bestowed some thought, is whether the draft from such an enrolment was valid; in other words, whether those upon whom the lot fell were not entitled to the increased chance to escape from the draft of which this omission has deprived them. The reason of the omission was that the militia law of the state required the enrolment in her militia of only persons between the ages of twenty-one and forty-five. The omission from the enrolment of the names of persons between the ages of eighteen and twenty-one years does not appear to have been sanctioned by the president or secretary of war. The authority from congress in the act of July 17, 1862, to make regulations, would not have enabled the president to sanction the omission, because the grant of the authority is followed in the same law by an express re-enactment, so far as the present question is concerned, of the provision of the act of 1792, that the enrolment of the militia shall, in all cases include all able-bodied male citizens between the ages of eighteen and forty-five years. This express enactment seems to have

excluded the age of persons liable to render military service from becoming one of the subjects of the exercises of the powers or regulation conferred on the president by congress. The question is whether the intervening state law authorized the disregard, in the state of the enactment of congress. Upon this question, as it has not been argued, no opinion can be expressed. The prisoner is discharged.