No. 2343.—NELSON CLEMENTS, HORACE CONE subrogated, *v.* O. B
GRAHAM & Co.

The courts of Louisiana will not entertain a suit founded upon a claim alleged to have been
acquired in consideration of army stores furnished to the enemies of the United States.
during the late civil war.

APPEAL from the Fourth District Court, parish of Orleans. *Théard,*
J. *Semmes & Mott,* for plaintiffs and appellants. *Bradford, Lea
& Finney,* for defendants and appellees.

TALIAFERRO, J. The plaintiff sues the commercial firm of O. B.
Graham & Co. for $45,000, the value, as he alleges, of a lot of cotton
belonging to him, which the defendents, by one of their firm, became
possessed of by illegal means, having acquired it in Mexico from per-
,sons illegally and fraudulently holding it under a purchase from
certain parties who, by violence and unlawful means, had taken it from
the plaintiff. The plaintiff charges fraud and bad faith in the defend-
ants in getting hold of this cotton, they being fully cognizant of all
the illegal proceedings of the persons through whom they pretend to
have acquired the cotton. There was judgment against the plaintiff
in the court below and he has appealed.

It seems that this plaintiff, who was a citizen of New York, entered
into a contract in 1862 with the insurgent States to furnish them with
what .he called "army stores," by which we understand arms and
munitions of war generally, to be used in promoting the rebellion
against the United States, then rife throughout those States. That
these army stores were to be delivered at some points in Texas, desig-
nated by the contracting parties. That in consideration for these army
stores the plaintiff was to receive cotton at some specified price per
pound. It is for the value of the cotton, or a part of it, so received,
as he alleges, in payment for the army stores delivered by him, that
the plaintiff is now contending.

Will the courts of this country, either State or national, entertain a
suit founded upon a claim alleged to have been acquired in considera-
tion of army stores furnished during the late rebellion to the enemies
of the United States engaged in active war against the government
and striving to subvert it? We think not. It would be inconsistent
with the dignity, as well as opposed to the public policy, of the United
States, to recognize such an ownership as that upon which the plain-
tiff founds this action. In 14 Howard, p. 38, the Supreme Court of the
United States declared that "no contracts can be enforced in the
courts of the United States, no matter where made or where to be exe-
cuted, if it is in violation of the laws of the United States, or is in
contravention of the public policy of the government or in conflict
with subsisting treaties." We think the judgment of the lower court
should be sustained.

It is therefore ordered, adjudged and decreed that the judgment of the lower court be affirmed with costs.

---

WYLY, J., *concurring.* The evidence satisfies me that Clements never had actual or corporeal possession of the cotton. It was sent by the confederate authorities from San Antonio on wagons employed in confederate service, with bills of lading addressed to Major Baughn, confederate cotton agent at Rio Grande City, and from there it was to be forwarded to Wm. W. Perkins, confederate agent at Matamoros, to whom also bills of lading were forwarded from San Antonio. The cotton was sent from the interior of Texas doubtless for the purpose of meeting the engagements of the confederate government with Clements, and it was designed that these agents, to whom the bills of lading were forwarded, should make the delivery at the mouth of the Rio Grande, pursuant to contract, and that the debt of the confederate government to Clements for army supplies was to be credited with the proceeds of the cotton at the price per pound stipulated in the contract. Being apprehensive that the cotton might not reach its destination, in view of the impending fall of the confederacy, and preferring to take the title of the cotton in himself while it was in transitu from San Antonio to Rio Grande City, Clements entered into a contract with Perkins, at Matamoros, for the cotton, and the bills of lading were indorsed and delivered by Perkins, agent for the confederate government, to Clements. This was in May, 1865. It was doubtless a sale and constructive delivery of the cotton, the drivers of the wagons becoming the bailees of Clements.

But it is shown that at the time of the contract between Clements and Perkins the former was a citizen of New York, a loyal State, and the latter was an inhabitant of an insurrectionary district; besides, he dealt only with Clements in behalf of the rebel government and as its agent.

Under the act of Congress commonly called the non-intercourse act, the parties were incapable of making a conventional obligation.

The contract of May, 1865, did not, therefore, transfer either the title or the possession to Clements. It was an absolute nullity.

The constructive delivery resulting from the transfer of the bills of lading and the sale of the cotton while it was *in transitu,* gave no possession, because the whole contract was totally void on account of the incapacity of the parties.

Clements could not appoint as his agents the wagon drivers having the cotton in charge while it was being hauled from San Antonio to Rio Grande City, because of the same impediment which prevented him from making a valid contract with Perkins. These drivers lived

in rebel lines, and they were employed in the service of the enemies of the United States.

The lawless persons who took the cotton, compelled the agent of the rebel government at Rio Grande City to give them the bills of lading before the cotton arrived. When it arrived on the wagons they took it from the drivers forcibly and crossed it into Mexico. The actual or corporeal possession of the cotton, therefore, never passed out of the rebel government or its agents and employes, the carriers, until it was taken by the robbers and crossed into Mexico and sold. It was yet in the actual custody of the rebel government, or its agents, when the robbery was committed.

Now, the plaintiff has no cause of action against the defendants, because their agent bought part of the cotton from the robbers in Mexico, knowing of the robbery, unless he had both ownership and possession thereof. He had neither, as we have just seen, because both his title and constructive possession resulted alone from the contract of May, 1865, with Perkins, at Matamoros, and that entire contract was absolutely void, because of the incapacity of the parties to make it, and because of the immorality thereof. The fact of possession outside of that void contract is not shown by the evidence. The plaintiff never got the fruits of that contract, because he never was able to get the actual possession or custody of the cotton, the object thereof. Owing to the character of the contract of May, 1865, the plaintiff can not get the aid of the court to enforce his rights resulting therefrom, the policy of the law being to give no remedy to an immoral contract. I therefore concur in the decision of this case.

---

Howe, J. I concur in the decree in this case. I do not think the plaintiff has established such possession as to entitle him to maintain his action, his contract with the insurgents being confessedly flagitious.

---

Ludeling, C. J., *dissenting.* In my opinion the question involved in this case is, whether or not a person who has acquired possession of property through a contract entered into against public policy, or in violation of law, can be deprived of this property by robbers, who take it and sell it to others who are aware of the nature of the robbers' possession. Or, to state the question in another form, whether the title to personal property, under an executed contract, can be questioned, on the ground of the illegality of said contract, by one who holds under a transfer from robbers with knowledge of the theft? I think the question should be answered in the negative. 2 Wallace 81, Brooks *v.* Martin; 17 How. 232, Blair *v.* Gibbes.

As against a mere trespasser, a perfect title is not necessary to recover in a petitory action.

The mere possession of the cotton in this case would be sufficient to authorize its recovery from the robbers or those who acquired from them with knowledge. 8 Cranch 421; 7 Wallace 573—Morris' case.

The evidence satisfies me fully that the contract between Clements and the confederate States, whereby he acquired the cotton in controversy, was an executed contract. He had delivered the army supplies to the agents of the confederate States, for which Colonel W. H. Broadwell, chief of the cotton bureau, under instructions from headquarters, directed certain cotton to be delivered to Clements or his agents. He says: "I arranged with Governor Morehead to *deliver* to him some cotton at Waco or thereabouts. My understanding was that the cotton would be at the risk of Governor Morehead or his principal, *after delivery at Waco or thereabouts.* My recollection is that Governor Morehead was willing to take the cotton in almost any manner that would place the cotton in *his possession or under his control.* My order for the cotton contemplated that the cotton would be pointed out by the officer to whom it was addressed, and *placed at the disposal of Governor Morehead,* or any one authorized by him to receive it," etc. The letter of instructions written by Colonel Broadwell to the officer at Waco corroborates Broadwell's testimony, and it contained the further direction: "The indebtedness of the government, for the settlement of which the cotton is to be applied, will appear in the shape of a copy from Wm. M. Perkins. This certified account Major Tevis will take up by using cotton at thirty cents per pound, less the expense of transporting and placing it on shipboard at Matamoros. Should any difficulty occur in adjusting this, the cotton can be used at thirty cents in your district, and an additional quantity can be given to pay the expenses of transportation and placing it on shipboard."

The evidence shows that quantities of cotton were collected together at Waco and San Antonio for Clements; that the bales of cotton were weighed and marked in his mark, and shipped for his account. The bills of lading stated that the cotton was consigned to Wm. M. Perkins for account of Nelson Clements. And Wm. M. Perkins and his clerk swear positively that, shortly before the capture of the cotton by Benavides and Slaughter, Nelson Clements and Wm. M. Perkins had a settlement in regard to the very cotton claimed in this suit. Wm. H. Campbell, the clerk of Wm. M. Perkins, says: "I can't say what became of the bills of lading in the hands of the carrier, and those kept at San Antonio; but those *in possession of Perkins were given to Clements,* who, in his settlement with Perkins, agreed to take the bills of lading weight as expressed in them, and so settled with Perkins, when he turned over the money vouchers and assumed pos-

29

session of the property." This is fully corroborated by Wm. W. Perkins. So does Clements himself swear positively to the same facts. Merriman swears that the carriers afterwards applied to him, as the agent of Clements, for payment for transportation of the cotton, under an agreement, with Clements. The indorsement or delivery of the bills of lading gave an irrevocable right to receive and control the cotton, if delivery had not been perfected before. 6 East. 41, Abbott on Shipping (7th Shee's edition) p. 326; 1 An. 84; 15 An. 438; 18 An 84.

I think that defendants can not invoke the statutes of the United States, interdicting commerce between citizens of the belligerents during the late war, to maintain their wrongful possession. 10 Wallace 464, Corbett v. Nutt; 8 Cranch. 421; 7 Wallace 573—Morris' case.

I can not concur in the views of my associates in this case.