# No. 3745.

## Court of Appeal, Parish of Orleans.

## F. W. ARMBRUSTER vs. ARTHUR BEHAN, et als.

1. In a third opposition to a seizure of property based upon the alleged ownership of said property, the issue to be tried between the third opponent and the party provoking the seizure is the fact of ownership. The third opponent stands in the attitude of a plaintiff, and is bound to administer proof of his opposition. But he cannot enquire into the validity of the proceedings between the plaintiff and defendants in original suit, or question the regularity of the seizure. His position is that of a plaintiff in a petitory action and he can recover only in the strength of his own title and not on the weakness of his adversaries. 12 A. 341; 8 N. S. 661; 15 A. 136; 1 R. 41.

2. Where a forfeiture of specific articles is imposed by a criminal statute as one of the punishments to be inflicted upon conviction of a person for a crime or offense, and the Court before which the personal offender is tried, convicted and sentenced, fails, omits or refuses to include in the sentence the forfeiture, no divestiture of title of the specific things results.

3. Where forfeiture is imposed by a statute as a punishment for crimes or offenses it can only be adjudged and enforced by a criminal proceeding, unless a different mode of procedure be expressly provided for.

4. Where a thing whereof there is an owner passes into a situation antagonistic to the law he may lose his ownership in it, whether personally guilty of crime or not, because the thing has offended. The punishment, if such it be called, falls on the thing and does not visit the owner's person. Though he lose it, and it lapses to another, or the State, the loss is not in the nature of a penalty for personal crime, hence the proceedings to obtain judicial condemnation is necessarily civil.

5. But where the forfeiture of specific articles is embraced in a criminal statute as a punishment for a crime committed by a person and depending upon conviction in personam, the forfeiture is then of a specie of fine and rests upon the same principle, as a sentence to pay a sum of money. The proceedings then is necessarily criminal and the forfeiture can, therefore, be declared only by a Court of competent criminal jurisdiction and as part of the sentence after conviction. Bishop New Criminal Law, Sections 816 and 944; Markham vs. Cole, 2 L. 585; State vs. Williams, 7 R. 252; State vs. Manestero, 4 A. 380; State vs. White, 13 A. 513; State vs. Robbins, 24 N. E. Rep's 978; Green vs. Briggs, 1 Curtis 311; U. S. vs. Three Tons of Coal, 6 Biss 379; Boyd vs. U. S., 116 U. S.

616; State vs. Smith, 2 Yerg. 272; Vowells vs. Commonwealth, 8 Ky. Law Rep. 74; Williamson vs. Cooke, 44 Miss. 367; Fisher vs. McGerr, 1 Gray (Mass.) 616; Boyles vs. Lynae, 1 Root. (con.) 195.

6. The meaning of the word forfeit has to be determined by the connection in which it is used. When used in Civil proceedings and in connection with the enforcement of Civil rights it contemplates an ordinary Civil judgment which need not even be penal in its character; but when used in a criminal law it denotes a punishment for a statutory crime and contemplates a criminal judgment or sentence.

7. When forfeiture is imposed by a statute as a punishment for a statutory offense there is no substantial difference between it and a fine. A fine is a pecuniary punishment for an offense and a pecuniary punishment called a forfeit is equivalent to the same pecuniary punishment called a fine.

8. There can be no such thing as a statutory forfeiture without judicial sentence. This is an elementary principle and a constitutional gaurantee. Cooley on Com. Lim. 362; U. S. vs. Fifty-six Barrels of Whiskey; 1 Abbot (U. S.) 92; U. S. vs. Stowell, 133 U. S. 1; U. S. vs. One Copper Still, 8 Bliss 270; U. S. vs. Brig Neuro, 19 How. 92; The Calidonia, 4 Wheat 100; The Thomas Gibbons, 8 Cranch 121; Gibson vs. Hoyt, 3 Wheat 354; U. S. vs. Brig Mars, 8 Cranch 41; U. S. vs. Nineteen Hundred and Sixty Bags of Coffee, 8 Cranch 398; Caldwell vs. U. S., 8 How. 381; Thalcher vs. U. S., 103 U. S. 685; Henderson's Distilled Spirits, 14 Wall 56; Gear vs. Bullock, 34 Ill. 94; Fire Department of New York vs. Kip, 10 Wend. (N. Y.) 266; Williamson vs. Cook, 44 Miss. 367.

9. No person by his misconduct can so forfeit a right that it may be taken from him without judicial proceeding in which the forfeiture shall be declared in due form.

10. Judgment is the consummation of the proceedings that the law requires to be instituted to ascertain the fact of forfeiture.

11. Where a forfeiture of property for the violation of law is made absolute by statute, the decree of condemnation, when entered, relates back to the time of the commission of the wrongful act. The title to the beneficiary is not consummated, however, until after judicial pronouncement, but the right to them relates backwards to the time the offense was committed so as to avoid all intermediate sales and incumbrances between the commission of the offense and the condemnation.

12. Act No. 12 of 1870, entitled "an act to repeal the thirteenth paragraph of Section 3 or an act entitled, 'an act to provide a revenue for the support of the State Government of Louisiana, and the manner of collecting same,' approved March 1869," to define and prohibit gaming and provide penalties therefor, and which provides as the several punishments to be inflicted, on conviction, of any person violating same, a fine and a term of imprisonment and

185

a forfeiture of specific articles used and employed in the game, is a criminal statute.

13. Forfeiture under this act no more follows, proprio vigore, the mere conviction, then do the other punishments imposed by the satute.

14. The forfeiture, like the fine and the imprisonment, to be effective and to operate against the convicted person, must be pronounced in the sentence, upon conviction of the accused person.

15. If the forfeiture, no less than the fine imposed by the statute, is omitted from the sentence, it cannot be imposed by a Court of exclusive civil jurisdiction.

16. Omitted from the sentence by the Criminal Court, no forfeiture ensues and, as a consequence, no title to the things which the Criminal Court could have decreed to be forfeited, but did not, is diverted from the convicted person.

17. Statutes imposing forfeitures must be strictly construed and construed most favorable to those against whom the forfeiture is directed.

18. All proceedings directed by the statute for enforcing a forfeiture must be strictly followed.

To the extent that the Judgment appealed from rejects the demand of Isidore Busha it is affirmed; but so far as it maintains the opposition of the City of New Orleans, it is reversed.

Appeal from Civil District Court, Division "E."

Dinkelspiel & Hart, Henry L. Lazarus, for Plaintiff and Appellant.

H . G. Dupre, Geo. W. Flynn, for Defendant and Appellee.

MOORE, J. This was a prooceeding by way of intervention and third opposition on the part of the City of New Orleans, and one Isidore Busha, by which they respectively claim title to and ownership of a certain fund amounting to the sum of $825, which was seized under garnishment process by the Civil Sheriff of the Parish of Orleans in the hands of the clerk of the Criminal District Court of said parish, in execution of a judgment which the plaintiff had obtained against the defendants.

The history of this money is as fololws: On the 18th July 1903, a banking game called "faro" was being played in a gambling estblishment, known as the "Monarch," and located at No. 18 Royal street, in the City of New Orleans. One John J. Finneran, being advised that his younger brother, Joseph, was

one of the players, secured entrance to this gambling house on the afternoon of the day stated, his intention being to get his brother away and to break up this vice. On entering he saw the game in full operation, his brother and some ten or twelve other persons being the players. The establishment was in charge of, and the game was operated by Taylor Doty, William Doty, Dennis Hannon, and William Moore. What happened when John J. Finneran entered the room and saw his brother gambling may best be told in his own language, given as a witness in this cause.

In answer to the question "What did you do when you got into faro bank?" He replied, "I told Taylor Doty that I was going to close them up, and I went over to the faro table and turned it over, and I took out a pistol and fired it and they all ran, and I took $825 out of he faro table." He and his brother, Joseph, then went down-stairs, where they met the police, who had been attracted thither by the discharge of the pistol, and who promptly arrested the brothers Finneran, carried them to jail, locked them up, and charged them with grand larceny. No arrest of the keepers of the gambling house appears to have been made. The $825 which John J. Finneran had taken out of the faro table was retained by him until he reaced the police lockup, when it was then taken from him and remained in charge of the clerk of the police station, to be used, as it was subsequently used, as evidence against him on the trial of the charge of grand larceny. What was the final result of the trial is not shown. Subsequently, to-wit, on the 24th day of August, 1903, the District Attorney filed his information against one Richard Behan, Taylor Doty, William Doty, Dennis Hannon and William Moore, charging them with having, on the 18th July, 1903, kept a banking house and banking game, and for aiding and assisting in keeping same. The $825 which Finneran had taken from the faro table were offered in evidence on the trial of these parties. Having obtain a severance, all these parties were separately tried, with the result that all of them, with the exception of Richard Behan, who was acquitted, were found guilty of "aiding and assisting in keeping a banking game and banking house," and were each, to quote the judgment "sentenced to pay one

187

thousand dollars as a fine, or in default of payment of said fine to suffer imprisonment in the Parish Prison for a term of six months, and to pay the cost of prosecution." No other penalty whatsoever was imposed by the judgment or sentence of the Court, and no disposition was there or at any time prior or subsequent thereto, made by the Criminal Court of this money. The dates of the respective sentences are as follows: Hannon and Taylor Doty, September 16, 1904; Moore and William Doty, November 28, 1904.

The garnishment herein was served on the 23rd of December, 1904. On the 3rd of January, 1905, on an *ex parte* application of the plaintiff, the garnishee was "ordered to deposit with the Civil Sheriff of the Parish of Orleans the sum of $8.25 upon the Judge of the Criminal District Court approving this order;" and there is an entry on the record of evidence herein to the effect that "it is admitted that the money seized in this case under the writ of fi. fa. was received by the Civil Sheriff on an order rendered by this Court followed by an order of the Criminal District Court." The latter "order," however, was not produced, and the record is absolutely silent as to its nature or character. How this money came into the hands of the clerk of the Criminal District Court is not shown. If his answers to the interrogatories in garnishment, which were propounded to him, and which form no part of the record, as they were never offered in evidence on the trial of these oppositions, can be noticed by us at all, we would then infer from the statement therein made by him that "this money was offered in evidence in the case of Richard Behan et als., No. 33,046, Sec. B, of the Criminal District Court, and from the fact that he is the clerk of that court, that he held this money simply as he holds in his said representative capacity, any other property or thing which may be offered and filed in evidence in the trial of a case in the Court of which he is the clerk. At any rate he does not pretend, nor is it otherwise shown by the record, that he held it, or that anyone else held it, prior to the seizure in the instant cause for any particular person or claimant, nor because it was seized or "arrested" as a thing "used in keeping the said banking house or in playing said banking game;" or be-

cause it had been "taken before any committing magistrate before whom any person had been taken accused of keeping a banking house," and who had committed such person for trial; nor because any committing magistrate or any other person or public official had taken "an inventory of all money, etc, etc., that may be seized" at all; nor because of any "forfeiture" thereof as a consequence of any conviction of any person or persons for a crime or misdemeanor; nor under or by virtue of any order, decree, judgment, or sentence of Court, referring to, or concerning, or affecting the status of said money.

This money, it also appears, found its way into the Bankruptcy Court, and was in the possession of the Referee in Bankruptcy in the matter of the bankruptcy of the firm of Behan & Duffy, where a claim to it was set up by one of the opponents herein—Busha. How it got into that proceeding, or when or why it left the possession of the Referee in Bankruptcy, the record furnishes no clue.

When this money, however, was delivered to the Civil Sheriff as aforesaid, the City of New Orleans then, on the sixth day of January, 1905, filed its intervention and third opposition herein, claiming title to and ownership of this money on the ground that by virtue of the terms of section 4 or Act No. 12 of 1870, under which act Behan et als. were prosecuted, convicted and sentenced, the said money, for as much as it was "used in keeping such (the) banking house or in playing such (the) banking game," for which offence the parties stated had been convicted, was ipso facto forfeited to and *en instanti* the *conviction* became the property of the City of New Orleans, and that this resulted without the necessity of any other or further proceedings, actions, order, decree, judgment or sentence of the Court whatever, and in despite of the fact that no sentence of forfeiture was pronounced or imposed by the Criminal District Court in its sentence of the said convicted parties.

On the 25th day of January 1905, Isidore Busha intervened and set up ownership in himself to this fund, basing his claim thereto on the ground that this particular and identical money was deposited by him with Richard Behan for safe keeping be-

189

tween 2 and 3 o'clock on the morning of July 18th, 1903; that it was then placed by Behan in the latter's own safe in the "Monarch" saloon; that its use and employment by any person on the 18th July, 1903, or at any other time, for purpose of gambling, was unauthorized by him or by said Behan; that the money seized by the Civil Sheriff in this cause is the same money taken by Finneran from the faro table on the 18th July and is the identical $825 deposited by him with Behan. The trial of these oppositions below resulted in a judgment dismissing and rejecting Busha's opposition, and maintaining the City's From this judgment the plaintiff and Busha appeal.

It was contended in oral argument at the bar of this Court, by the counsel for one of these opponents, that as the money claimed by the opponents was not shown to have ever belonged to the judgment debtors at all, its seizure as a consequence was without any legal effect. It is true that there is no proof in the record that this money ever belonged to any judgment debtors, but this is a matter in which the opponents can have no interest. Their right to this money does not depend upon the fact that it did not belong to the defendants, but it does depend upon the fact of the opponents, or either of them, showing that it is theirs. If they fail in doing this it is then no concern of theirs to whom the money belongs or what disposition may be made of it. Proceedings of this character is likened to the petitory action, where the plaintiff must recover on the strength of his own, and not on the weakness of his adversaries title. This proposition has been emphasized in Wafer vs. Pratt, 1 R. 41, where the Court said:

"When the sheriff is in possession of property by virtue of a seizure under execution he must be considered as a rightful possessor holding for the benefit of the plaintiff in the writ until it be shown that the property seized belongs to another person than the defendant. ...... The right of a third party to oppose an execution is limited to cases where he owns the property or has a privilege on it. When the former ground is assumed the person making the opposition is in the position of a plaintiff in a petitory action; he must make out a clear title."

In Lacy vs. Buhler, 8 N. S. 66, it is said:

"When a sheriff is in possession of property by virtue of a seizure under a writ of execution he must be considered as a rightful possessor holding for the benefit of the plaintiff in·the writ, until it be clearly shown that the property seized belongs to some third person."

And in Harper vs. Bank, 15 A. 136, the Court said:

"In a third opposition to a seizure of property, based upon the alleged ownership of said property, the issue to be tried between the third opponent and the party provoking the seizure is the fact of ownership. The third opponent stands in the attitude of a plaintiff and is bound to administer proof of his pretention in order to sustain his opposition. But he cannot inquire into the validity of the proceeding between the plaintiff and defendant in original suit."

Proceeding now to the consideration of the merits of the respective oppositions, we will first dispose of Busha's. As to his claim of ownership, it might be sufficient for us to say that —pretermitting all other facts disclosed by the evidence, and which furnish us ample warrant for reaching the conclusion that his claim is without merit, there is lacking in his proof an essential element necessary to the recognition of his arrested right *id est* the "identity" of the money seized by the Civil Sheriff in this cause, with the money which he testifies was handed by him to Behan for safe keeping, and which was locked up in the latter's iron safe. There is an admission in the record, that the money now in the hands of the Civil Sheriff is the same money which was taken by Finneran from the gambling house on the 18th July, 1903, but there is neither admission nor testimony to the effect that this is the same money which Busha handed to Behan at the time and under the circumstances testified to by both. On the contrary, these two witnesses, and they are the sole witnesses who testified as to this particular transaction, declare that they can not say that it is the same money.

During Behan's examination as a witness on behalf of Busha,

he was taken in hand by the Court, who questioned him as follows: "By the Court: Q. In substance then, Mr. Behan, I understand you to testify that on this morning of July 18, 1903, Mr. Busha gave you, in your hand, and openly, $825 in bills, which you counted and then placed in your safe?" To which he replied, "A. Yes, sir. Q. And you have no further knowledge of what became of this $825? A: No, sir. Q: Of your own knowledge? A: No, sir."

And Busha, on cross-examination, was asked: "You don't know whether or not this is the same money?" To which he replied, "No, sir, I can't say that." Indeed, the learned counsel for Busha do not claim that it is shown that "presumtively" that this is the same money. In their printed argument they say: "From the evidence we are justified in stating the conclusion that the fund deposited with Behan was removed from its place of deposit on the morning of the 18th of July, and the fund seized being the identical amount so deposited presumtively, we may say, is reasonably the same fund entrusted by Busha to Behan."

There is not the slightest evidence to show that any money "was removed from its place of deposit on the morning of the 18th July," if any money was so deposited; that it was this same money which was placed in the drawer of the faro table, from which drawer Finneran had taken the money; or that any one other than Behan had the combination of the safe, or how or when the money left the safe, or by whom taken. All that Busha testifies to is that he handed the money to Behan at about 2 or 3 o'clock on the morning of July 18th, 1903, and that he saw Behan put the money in and then lock the safe. From that moment he never saw the money again, until it was produced in the bankrutpcy proceedings before the referee. Behan corroborates Busha as to the receipt of the money and the placing of it in his safe, and locking the safe. He first testified that he didn't know whether any one else had the combination of his safe but himself, and he did not know whether the money ever left his possession or not. Then, further on, testified that the money did leave his possession, and when pressed to say who else, if any one else, had the combination of his safe, he refused

192

to answer; then finally admits that he has no knowledge of what became of the $825 after he locked it up in the safe.

Besides this it is shown by the testimony of Joseph Finneran that the money used as the banking fund, and which was in the drawer of the faro table, was constantly changing hands and became confused with other money. The "bank" quite often being replenished with the players' money, in their purchase of "chips," and occasionally being diminished by being paid out to satisfy the players winnings, it would be impossible, as money has no "ear-marks" for any one to say, as no one does say, that this money is the same money that those who were operating the game originally placed in the faro drawer, even were it shown, which it is not, that the money originally placed therein came directly from Behan's safe to the faro drawer, and was originally the package of money which Busha says was put in Behan's safe. The judgment, respecting Bushas' opposition, is not error.

---

The claim of the City of New Orleans involves interesting questions of law, which questions may be formulated thus:

1st: Where, as a punishment for a crime or misdemeanor, and to be inflicted upon a conviction *in persona,* as contra-distinguished from the conviction of an offending thing under an information for a quasi crime *in rem,* a forfeiture of certain things used in the commission of the offence for wrich the accused person is convicted is, in addition to the other punishments imposed by the statute, does the mere fact of conviction ipso facto divest the title of the owner to the thing and so *instanti* invest full title and ownership therein to the political authority to whose benefit all fines and forfeitures inure, and notwithstanding the fact that the Court before which the conviction was had, and which passes sentence on the convicted person, refused, failed or neglected to include in the sentence the forfeiture, and which, neither at the time of pronouncing sentence, nor prior or subsequent thereto made no order, decree, judgment or sentence, or gave any directions concerning or affecting or referring

to the status of the thing, or concerning its forfeiture, or in reference to its title or concerning its disposition or destiny.

In other words, when forfeiture is imposed by a criminal statute as a punishment for personal crime, must not this punishment be included in the sentence of the convicted person, in order to have the effect of divesting title from the former owner to the beneficiary of the forfeiture.

2: Where the word forfeiture is employed in a criminal statute and has indicated a punishment for personal crime, and where upon conviction of the guilty person the forfeiture is not included in the sentence can, in the absence of any words in the criminal statute clearly indictaing that a civil proceeding may be instituted to enforce the forfeiture or consummate the title, if title follows conviction alone—a civil proceeding lie to enforce the forfeiture and recover the property for the beneficiary of the forfeiture;

3: If forfeiture results from conviction alone and needs not for its enforcement or consummation a judicial declaration or sentence of the Court before which the conviction was had, and whether a civil action may or may not lie for its enforcement, can the beneficiary or owner in whose favor the forfeiture inures, when the statute declares that the thing for which the forfeiture is provided shall be first seized and taken before a committing magistrate, who shall take an inventory of same, and that upon committing for trial the person accused of the crime denounced by the statute, he shall also commit the thing seized to the trial Court, and finally that "all of which shall, on conviction, be forfeited for the use, etc., etc."—take anything also save and except such things as were "seized" at the time and in the manner and under the circumstances provided by the statute?

In other words, is not "seizure," where the statute provides for the forfeiture only of the things seized and inventoried, a jurisdictional question, and (must not the *res* be in the .possession of the Court under the lawful seizure made in the manner provided by the statute, before any forfeiture issues, even if forfeiture follows conviction alone, or can be decreed, if decree, judgment or sentence is necessary.

The statute which, with the facts already stated, suggests these inquiries, is Act. No. 12, approved February 5, 1870 ,and entitled an act to repeal the 13th. paragraph of section 3 of "An Act to provide a revenue for the support of the State government of Louisiana and the manner of collecting same," approved March 1869; to define and prohibit gambling and provide penalties therefor.

The sections of this act which are pertinent to and concern this discussion, are as follows:

Sec. 2: x x "That whoever shall keep a banking game or banking house at which money or anything representing money or any article of value shall be bet or hazarded, or shall aid and assist in keeping one shall, on conviction for the first offence be fined not less than $1000 nor more than $5000, and on conviction for a second offence not less than $5000 nor more than $10,000 and be imprisoned at hard labor not less than one nor more than five years.

Sec. 4: "That it shall be the duty of the superintendents and other officers of police, or any public officer, to arrest and take into custody any person keeping any banking game or aiding or assisting in keeping same, together with all the tables, money or representatives of money, implements and other paraphernalia which may be used in keeping such banking house or in playing such banking game, and take or cause them to be taken before any committing magistrate, who shall commit such persons for trial, if upon a hearing there be sufficient cause therefore, it shall be the duty of the officers committing such offenders to take an inventory of all money or its representative, tables or other implements or paraphernalia that may be seized and brought before him, all of which shall, on conviction, be forfeited for use of the parish in which the offence is committed."

Sec. 6 x x x That the offence of keeping a banking house or playing a banking game, as prohibited in the preceding sections of this Act, is hereby declared to be a crime and misdemeanor and *to be tried only by the Court of criminal jurisdiction where the offence is committed.*"

It is under this statute that Doty et als, were convicted and sentenced as stated supra; and it is under Sec. 4 of this Act that

the city claims that the change in status of this money occurred and, as stated, as a consequence of the conviction only—not of sentence—of Doty and his associates it claims its title to this money vested.

If this statute is not a criminal statute and the forfeiture thereon is not, in legal intendment and effect a punishment for personal crime or misdemeanor; or if it is a criminal statute, and so far at least as the forfeiture is concerned it is not a punishment for a personal crime and depending upon a conviction *in personam,* but is intended as a punishment of a guilty thing depending upon the conviction of the offending thing by information *in rem* and without regard to the innocence or guilt of the owner, as in the case under certain sections of the custom, internal revenue and navigation laws of the United States; or if the forfeiture, by clear intendment of the statute, contemplates that upon the mere conviction of the person the thing which by him was made to offend, shall *ipso facto* and without any further legal proceedings or judgment, order, decree or sentence of the Court to that effect, rest in and becomes the property "of the parish in which the offence is committed" and entitle the parish to at once take possession of it, the city's contention (if in the contingency last stated it could overcome the constitutional inhibition against depriving anyone of his property without due process of law) might be well founded.

It may not be doubted that the statute is a criminal statute, and that it contemplates fine and forfeiture and imprisonment as the several punishments for the crime denounced.

As a consequence of a conviction is personam the person convicted may be fined a sum within certain limits and under Rev. Stat. 1515 may be imprisoned in default of payment of the fine; and for a conviction for a second offence he shall be both fined and imprisoned. As a further punishment "all the tables, money or representatives of money, implements and other paraphernalia which may be used in keeping such banking houses or in playing such banking game" shall when seized by the police, brought before the committing magistrate, inventoried by the

latter and sent up to the trial Court, be forfeited upon the conviction of the person charged with violation of the statute. Neither the tables nor money, nor representatives of money, nor implements, nor other paraphernalia which may be used in the gambling house or may be used in playing a banking game are declared forfeited simply because they were intended to be used or *may* be used in such house and for such purposes.

The forfeiture results not from the use to which these things may be or were intended to be put, but from the use to which they were actually put by a person who was convicted for so employing them. As a punishment of the person for the crime or offence which he has committed these things are forfeited. Money, though even said to be "the root of all evil," was certainly never contemplated by the law-maker to be such an "offending thing" that it could, by its own evil or offensive character and without the guilty act of the person who caused it to offend, so offend the law as to merit forfeiture. It is not the money, or the things mentioned in the act supra, which offend, but it is the *person* who employs these things contrary to the law that commits the offence and it is upon *his conviction* and his punishment for his wrong; that he is punished by having these things taken from him.

In this statute, as in all other criminal statutes where the word occurs, *forfeiture* is synonymous with *fine*.

As said in Exparte Alexander, 30 Mo. App. 108-109:

"The meaning of the word "forfeit" is to be determined by the connection in which it is used. When used in civil proceedings and in connection with the enforcement of civil rights, it contemplates an ordinary civil judgment which need not even be penal in its character; but when used in a criminal law it denotes a punishment for a statutory crime; the meaning of the word is equivalent to fine."

"When imposed as a punishment for a statutory offence there is no substantial difference between a fine and a forfeiture. A fine is a pecuniary punishment for an offense, and a pecuniary punishment, called a *forfeiture,* is equivalent to the same pecuniary punishment called a *fine.*

197

State vs. McConnell, 70 N. H. 158 (46 Atl. Rep. 458).

> "It may be conceded without hesitation that the words penalty and forfeiture are often used in a broad sense as including every description of punishments applying to public crimes."

U. S. vs. Mann, 1 Gall (U. S.) 178.

> "There is another kind of forfeiture which happens where a person, on conviction, is sentenced to forfeit specific articles of property instead of or in addition to a fine. This class of cases rests upon the precise principle of fines."

U. S. vs. 3 Tons of Coal, 6 Bess, (U. S.) 379.

In this latter case Dwyer D. J., discussing, in an exceedingly learned opinion, the difference between a forfeiture in rem under certain sections of the internal revenue laws, and a forfeiture as a punishment for personal crime, said:

> "I think I speak with accuracy when I say that in these proceedings (forfeiture in rem under the internal revenue law) the distilleries and other property in question are the things which (if any offence at all has been committed) are to be *primarily considered as the offenders,* or rather, the offences if any attach primarily to them, and that these proceedings in rem stand independent of and wholly unaffected by any criminal proceedings in personam. The forfeiture is not in an apt and legal sense a punishment for crime, even though a crime be committed when the forfeiture is incurred. The true test, I think, lies here. When the judgment of forfeiture necessarily carries with it and as part of it a conviction and judgment against the person for the crime, the case is of criminal character. But where the forfeiture does not necessarily involve personal conviction and judgment for the offence, and such conviction and judgment must be obtained, if at all, in another and independent proceeding, then the remedy, by way of forfeiture, is of civil and not criminal nature. Understanding the words "criminal cases" in which they are generally used and upon the views already indicated, I must construe them

as meaning a case in which punishment for crime is sought to be visited upon the person of the offender in the ordinary course of criminal prosecution, in contra-distinction to a proceeding in rem to affect a forfeiture of the thing to which the offence primarily attaches."

Citing Green vs. Briggs, 1 Curtis (U. S.) 317, the Court adds:

"Liquors of the plaintiff had been seized on the ground that they were kept and deposited for the purpose of sale contrary to law. The penalty in such a case was forfeiture and destruction of the property, and even an imprisonment. The Court held, that the proceedings under that statute were criminal in their nature, their object being to inflict upon the person fine and imprisonment and at the same time to adjudicate a forfeiture of the liquors. The process, and the judicial action under it, are directed against the offender and his property. *It is not possible to separate the proceedings under this act, against the property, from the proceedings against the* person. The case of Fisher vs. McGin et als., 1 Gray 1, was similar in character to Green vs. Briggs, the forfeiture and punishment by fine for violation of the law *being* enforcible in the same action. ......

"It may be said of this case, and that of "Curtis" that the forfeiture provided for was, conjointly with fine and imprisonment, clearly made a punishment for a criminal offence. It was a forfeiture which was by the statute itself made to depend alone upon that intent in the mind of the owner of the property which, as Mr. Bishop points out in his Criminal Law, Vol. 1, p. 702-709, is to be distinguished from a forfeiture resulting from particular circumstances attending property imposed some times with and some times without a conviction of the owner for crime."

Referring to Green vs. Briggs, 1 Curtis, 311, (10 Fed. Cases No. 5764, p. 1113) we find that that was an action of replevin for a quantity of wine and spirits alleged to have been taken unlawfully and detained by defendant who justified the taking and

199

detention by virtue of certain proceedings taken under an act of the General Assembly of Rhode Island, passed at its May Session in 1851, and entitled "An Act for the supervision of drinking houses and tippling shops which provided that upon a complaint in writing under oath, to some justice of the peace, setting forth that they have reason to believe and do believe that spiritous or intoxicating liquors are kept or deposited or intended for sale in that town or city by some person not authorized to sell the same, under the provisions of the act the justice of the peace is to issue a warrant of search, directed to the sheriff, his deputy, the town sergeant or constable in the county, one of whom is to proceed to search the premises described in the warrant—it not being required that any particular person should be named in the complaint as the person intending to sell such liquor contrary to law, nor was any person in fact named in the complaint which was the foundation of the proceedings in question—and if any spiritous or intoxicating liquors are found he is to seize, secure and keep them until final action shall be had therein.    The officer is further required to summon the owner or keeper of the liquors seized, if known to him. Upon the return of the warrant, if the owner or keeper so appear, and the justice is of the opinion that the liquors have been kept or deposited for sale contrary to the provisions of the act, he is to adjudge a forfeiture, cause them to be destroyed, and inflict a fine of $20, or if the fine is not paid, imprisonment for 30 days, upon such owner or keeper.

"These proceedings," said Mr. Justice Curtis, sitting on circuit, and with whom sat Pittman D. J., "are clearly criminal in their nature.    The object is to inflict upon the person fine and imprisonment *and at the same time to adjudicate a forfeiture of the liquors.*    The process and the judicial action on it are directed both against the offender and his property.    It is true the warrant does not require the officer to arrest anyone, but only to seize and hold the property and summon the owner or keeper to him.    But the arrest of property to compel appearance is a known and effective mode of proceeding against the owner of that property.    Indeed all mesne process, both civil and crim-

inal, which results in giving bail for an appearance, is only a mode of binding a certain amount of property on non-appearance. And when the law provides that the property is to be seized and detained and adjudged forfeited if the owner or keeper fail to appear, and if he do appear that he shall be fined and imprisoned if found guilty it has brought into action a criminal process both against the owner and the property."

In U. S. vs. Ulrie, 3 Dillon, p. 532, it became necessary to determine the meaning of the words "penalty," forfeiture," "liability" and prosecution, in Sec. 13, U. S. Rev. Stat, which reads as follows:

"The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture or liability incurred under such statute, unless the repealing act shall so expressly provide and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecutions for the enforcement of such penalties, forfeitures or liability."

Mr. Justice Miller, sitting on Circuit, with Treat D. J., as the organ of the Court, said:

"Now the counsel for the defendant argues that neither the word "penalty," "forfeiture," nor "liability" is equivalent to the word "punishment," and therefore that the section under which these indictments are drawn is repealed, unless the penal section is comprehended by the term "penalty," and this, he insists, means only that which can be enforced by a civil action; or by the term "forfeiture," which relates merely to property; or by the term "liability," which he says means merely subject to a civil proceeding . But, without attempting to go into a precise technical definition of each, it is my opinion that they were used by Congress to include all forms of "punishment" for "crimes," and as strong evidence of this view, I found during the progress of the argument and called the attention of the counsel to a section which prescribed fine and imprisonment for two years, wherein Congress used the words "shall be liable to a pen-

alty of not less than $1000 ............... and imprisonment not more than two years." "Moreover, any man using common language might say, and very properly, that Congress had subjected a party to a liability, and if asked what liability, might reply, a liability to be imprisoned. This is a very general use of language, and surely it would not be understood as denoting a civil proceeding. I think, therefore, that this word "liability" is intended to cover every form of punishment to which a man subjects himself by violating the common laws of the country. Besides this, my brother Treat reminds me, the word "prosecution" is used in this section, and that usually denotes a criminal proceeding."

The same question arose in the U. S. vs. Reisinger, 128, U. S. 398, 402, the Court, speaking through Mr. Justice Lamar, said:

"The only grounds upon which the correctness of this interpretation may be doubted is that the words "penalty," "forfeiture" and "liability" *do not apply to crimes and the punishment thereof,* such as we are now considering. We cannot assent to this. These words have been used by the great masters of common law and the elementary writers as synonymous with the word punishment in connection with crimes of the highest degree."

Mr. Bishop, in his New Criminal Law, vol. 1, 816, says:

"Where a think whereof there is an owner passes into a situation antagonistic to the law, he may lose his ownership in it, whether personally guilty of crime or not, because the thing has offended. Punishment, if such it be called, falls on the thing, and does not visit the owner's person. Though he loses it, and it lapses to another, or the State, the loss is not in the nature of a penalty for personal crime."

Ibid, 944, he says:

"But where the forfeiture of specific articles is embraced in a criminal statute as a punishment for a *crime committed by a person and depending upon conviction in personam,* the forfeiture is then of a species of *fine* and rests upon the same

principle as a sentence to pay a sum of money. The proceeding then is necessarily criminal, and its forfeiture can therefore be declared *only* by a Court of competent criminal jurisdiction and *as part of the sentence* after conviction."

In U. S. vs. H. P. Claflin et al., 97 U. S., p. 546, which was a proceeding by way of an action for debt, to recover penalties prescribed by the 4 sec, of an act of Congress, approved July 18, 1866, entitled an Act to prevent smuggling, & for other purposes, (Sec. 8082 Rev. Stat. U. S.) which reads as follows:  " .... such merchandise shall be forfeited and the offender shall be fined in a sum not exceeding $5000 nor less than $50, or be imprisoned for any time not exceeding two years or both;" the Court said, that it is obvious that its provisions cannot be enforced by any civil action, as it was clearly a criminal statute.

In our own State many statutes imposing forfeitures have been the subject of discussion and decision by the Supreme Court, and the line has been clearly drawn  between  penal  statutes wherein forfeitures are imposed, and criminal statutes, where forfeitures are intended as a punishment for crimes.

Is Markham vs. Close, 2 La., 585, Art. 192 of the C. C. of 1825, which provides:

> In like manner no master shall be compelled to sell his slave, but in one or two cases, to-wit  . . . . . . the second,, when the master shall be convicted of cruel treatment of his slave, and the judge shall deem proper to pronounce, besides the penalty established for such cases, that the slave shall be sold at public auction in order to place him out of the reach of the power which his master has abused," was held to be a criminal statute.   Said the Court: "The conviction here spoken of, which must precede  the order to sell, we think evidently means condemnation or a criminal proceeding.   The term cannot be correctly applied to a jdugment pronounced in a civil case, and we are not at this moment aware of any instance in which the legislatures have so used it."

In State vs. Williams, 7 R. 252, the first section of the act of 29 January 1817, which provides that "any  person  who

shall import into this State any slave who had been convicted of certain crimes shall upon conviction thereof before any Court of competent jurisdiction be fined for each and every slave, in the sum of $500, one-half to be applied to the use of the State and the other half to the use of the informer, and that the slave or slaves so imported shall on conviction be seized and sold for cash to the highest bidder after 15 days' notice of time and place of sale, one-half of the purchase money to be applied to the use of the State, and the other half to the informer," was held to be a criminal statute. "The distinction between criminal laws and penal statutes," said the Court, "is clearly marked in our legislative enactments." . . .

"the Act of 1817 is a criminal law."

In the State vs. Manesterio, 4 A. 380, the act approved April 2, 1832, entitled "An Act more effectually to prevent slaves from obtaining spiritous and intoxicating liquors without the consent of their masters," and which provides in 1, that "if any person shall sell, give or deliver to any slave of any other person any spiritous and intoxicating liquors without the written consent of the master shall, on conviction thereof, forfeit any license or .licenses which he may have or hold under the authority of this State, and be forever deprived of the right of obtaining or holding any such license, and be sentenced, moreover, to pay a fine which for the first offense shall not be less than $200 nor more than $400; and for the second offense not less than $400 nor more than $800," was held to be a criminal statute.

In State vs. White et al., 13 A. 573, the XVI Sec. 41 of the act of 1803 (B. & C. Dig. p. 61,) which provides that if any person shall inflict cruel punishment on a slave, except in the cases specified "the said person shall forfeit and pay for every offense a fine not exceeding $500.00, nor less than $200." The XVII of Sec. 41 provides, that "if the slave be mutilated," beaten, etc., contrary to the true meaning of the act, when no one shall be present, in such case the owner or other person having the charge or management of said slave shall be deemed responsible

and guilty of said offense, and shall be prosecuted without further evidence, unless the said owner or other persons so as aforesaid can prove the contrary by means of good and sufficient evidence, or can clear himself by his own oath, which said oath every Court under the cognizance of which said offense shall have been examined and tried, is by this act authorized to administer," was held to be a criminal statute because of the use of the words therein of 'conviction' and 'offense.' "These words," said the Court, "imply a prosecution by information or indictment."

As more immediately applicable to the particular statute we are discussing is the decision in State vs. Markham, 15 A. 498. In that case the defendant was indicted for "keeping a banking game commonly called faro" under Secs. 96—7—8—& 99 of Act 180 of 1855 (Rev. Stat. 1854, p. 151), Act No. 12 of 1870 being a re-enactment of these sections almost verbatim. The question presented in that case was whether the proceedings is a case of the character referred to in the act were to be civil or criminal. The Court held, that the person proceeding under that act was "a proscution for a criminal offense and not a suit or prosecution for the recovery of a fine or forfeiture."

Besides all this, the act of 1870, unlike the act of 1855, contains the specific declaration in its 6th section, that the offense denounced "in the preceding sections of this act is hereby declared to be a crime and misdemeanor *and to be tried only by the Court of criminal jurisdiction where the offense is committed."*.

The statute of 1870 being a criminal statute, it follows that the fine, the imprisonment and the forfeiture which the act imposes are but the several punishments which may be inflicted on the person who may be convicted of a violation of the act; and as the person offending can be "tried only by the Court of criminal jurisdiction where the offense is committed," and must receive his sentence from that Court, if he is convicted, it follows as a legal and logical conclusion that if by that Court no judgment or sentence of forfeiture has been pronounced against him, there has been no divestiture of title of his property.

It is confidently asserted that no case can be found where forfeiture as a part of the punishment to be imposed was ever pro-

nounced by the Court before which the conviction was had, as a part of the judgment or sentence. It might be sufficient answer to this to say, that no case can be found where a "forfeiture" imposed by a criminal statute as a punishment for crime or misdemeanor, the forfeiture has ever been said to operate where it was not included in the sentence. But it is not a fact that no case can be found where it was not pronounced in the sentence. Indeed, text writers on criminal law assert it as an elementary proposition that the forfeiture must be judicially declared and that it can be so declared *only* by the Court in which the conviction was had, and as part of the sentence. Bishop in his New Criminal Law, vol. 1, 816, says:

"Where a thing whereof there is an owner passes into a situation antagonistic to the law, he may lose his ownership in it, whether personally guilty of crime or not, because the thing has offended; the punishment, if such it be called, falls on the thing and does not visit the owner's person. Though he loses it and it lapses to another, or the State, the loss is not in the nature of a penalty for personal crime."

Adding Ibid 944:

"*But where the forfeiture of specific articles is embodied in a criminal statute as a punishment for a crime committed by a person and depending upon a conviction in personam, the forfeiture is then of a species of fine and rests upon the same principle as a sentence to pay a sum of money. The proceeding then is necessarily criminal and its forfeiture can therefore be declared only by a Court of competent criminal jurisdiction and as a part of the sentence, after conviction in personam.*" L

In State vs. Manesterio, 4 A. 380, a conviction under the act of 2d April, 1832,—the sentence not only declared the fine but included in it the forfeiture "of any license or licenses he (the convicted person) may hold under any authority of this State, and to be forever deprived of the right of obtaining and holding any such license."

In State vs. Williams, 7 R. 252, a conviction under the act of 29 January 1817,—the sentence included the forfeiture of the slaves as well as the imposition of a fine on the person convicted,

206

for importing the slaves into the State.

The regularity and legality of the criminal Court including in the sentence the forfeiture of the slaves (the peculiar wording of this statute making it doubtful whether there should not have been a civil proceeding for the forfeiture) subsequently received legislative and judicial affirmance. See Act 18 March 1852, p. 186—No. 268; Act No. 1, Jany 23, 1856; Gill vs. Williams, 12 A. 219.

In Markham vs. Close, 2 La. 585, the Court held that under Art. 192 of the Code of 1825, the sale of the slave provided for therein could not be demanded in a civil proceeding, hence it follows that it must be included in the sentence in a criminal proceeding

In State vs. Markham, 15 A. 498, a conviction under the gaming act of 1855, and which is similar in its terms to the act of 1870, the forfeiture clause being included in both, the Court held the proceedings thereunder could not be by "suit for the recovery of a fine or forfeiture," but must be a "prosecution for a criminal offense;" the forfeiture must necessarily be included in the sentence.

Referring to the jurisprudence of other States, we find that in State vs. Robbins (24 N. E. Rep. 978), a statute of Indiana provided that upon conviction of a person for gambling etc. a fine was to be imposed, and that "the sheriff *forthwith* destroy or cause to be destroyed the apparatus, devices etc. used for the unlawful purposes." The defendant was convicted on the 13th May 1889 of the offense of gambling, and a fine was assessed against him. On the 27 May 1889 the prosecuting attorney moved the Court for an order directing the sheriff to destroy the gaming apparatus, etc., in the possession of the officer. The Court denied the motion, and on appeal the Supreme Court said:

"Th destruction of the implements employed in the commission of the crime must be regarded as in some sense a part of the penalty to be adjudged by the Court against the offender, and the *order of forfeiture must be a part* of the judgment pronounced in the case. After the penalty has been assessed and

207

final judgment has been pronounced, and the case ended, the Court cannot again take jurisdiction upon a mere motion and proceed with another hearing and make another order enforcing punishment of an *additional penalty* against the defendant or his property. The conclusion follows that, after having pronounced final judgment the Court had no jurisdiction to enter upon an inquiry and make an order for the destruction of the articles seized. The application should have been made before or at the time judgment was pronounced. The order for the destruction of the property was therefore correctly refused, for the reason that it was made too late."

In Boyles vs. Lynde, 7 Root (Conn.) 195, the Court held that in a prosecution for an offense against a statute which imposes a fine and also a ferfeiture of the utensils by which the offense of fishing with seines at certain seasons of the year is committed, on conviction the judgment ought to be for the utensils.

In State vs. Smith, 2 Verg. 272, it was held that where the statute provided, besides fine and imprisonment, that any person convicted of gaming shall be disqualified to hold any office of trust or profit for five years," it is error, on conviction, not to enter up the judgment of disqualification .

In Vornells vs. Commonwealth, 8 Ky Law Rep., 74, cited in American Digest, Century E. 5—Verbo gaming, vol. 24, p. 815, a statute declared that a person indicted for the offense of setting up a faro bank, shall be deemed infamous after conviction and be forever thereafter disqualified from exercising the right of suffrage and from holding any office of honor, trust or profit." Held the disqualification must be included in the sentence.

In Williamson vs. Cook, 44 Miss., 367, the statute which declares that the right to sue in any of the Courts in the State is forfeited and cannot be exercised by any citizen of the State who engaged in the "rebellion," and who is not within the terms of the Amnesty Act, was held not to be operative until there was a judicial sentence of forfeiture. The court said: "There can be no such thing as a statutory forfeiture without judicial sentence."

In Fisher vs. McGinn et al., 1 Gray (Mass.) 1, the Court said that the forfeiture and punishment in personam is enforceable in the same action.

In Green vs. Briggs, 1 Curtis (U. S.) 311 the Court said that it is not possible to separate, in cases of this character, proceedings against the property from proceedings against the person.

In Boyd vs. U. S., 116 U. S. 616, the Court said that if the government elects to proceed criminally under the State, then in that case the forfeiture of the goods must be included in the sentence, or "there can be no such thing as statutory forfeiture without judicial sentence,"—is the emphatic language of the Court in Williams vs. Cook, 44 Miss., 367, supra; and this declaration is but the affirmance of a fundamental principle and a constitutional guarantee.

Mr. Cooley, in his work on Constitutional Limitations, original page 362, says: " . . . . . Nor can a party, by his misconduct, so forfeit a right that it may be taken from him without judicial proceedings *in which the forfeiture shall be declared in due form. Forfeitures of rights and property cannot be adjudged by legislative act and consideration, without a judicial hearing, after due notice, would be void as not being due process of law...* Even Congress, it has been held, has no power to protect parties assuming to act under the authority of the general government during the existence of a civil war, by depriving persons illegally arrested by them of all redress in the Courts.

"And if the legislature cannot confiscate property or rights, neither can it authorize individuals to assume, at their option, powers of police, which they exercise in the condemnation and sale of property offending against their regulations, or for the satisfaction of their charges ·and expenses in its management and control, rendered or incurred without the consent of the owners."

As stated by Mr. Cooley, a right can be taken from no one, not only without judicial proceedings but judicial proceedings necessarily in a Court of competent jurisdiction, and after the

"forfeiture shall be declared in due form" *id. est.* by judgment or judgment or sentence. In the instant case there was instituted the proper judicial proceedings, in which the forfeiture could have been declared. The accused parties were duly tried and convicted in the only Court which could have had jurisdiction of the case. They were duly sentenced, and the sentence could have included a forfeiture of this money, if the criminal Court before which they were tried had considered that the evidence introduced in the criminal trial established the fact that this particular money was used in the gambling game on the occasion charged in the information. Whether because the evidence offered in the criminal trial did not warrant a sentence of forfeiture; or because of error or oversight on the part of the judge, or because of clemency, or for whatever cause it might be the forfeiture was not included, it is enough to know that it was not declared until the forfeiture is declared in due form, how can it be said that the title of the owners have been divested and that title is now vested in another?

If the forfeiture *had been* declared by the judge who sentenced the convicted parties, could it be successfully contended that notwithstanding the sentence of forfeiture a Court of exclusive civil jurisdiction could review that sentence and decide that title to the thing forfeited had not been diverted because the evidence offered in the civil trial did not warrant the forfeiture. Where the forfeiture, as in the instant case, has not been declared by the only Court which could have declared it, *id. est.*, the criminal Court, can a civil Court determine that because the evidence administered on the civil trial establishes the fact that the forfeiture should have been declared, title *has been* divested from the former owner and is invested in the new owner? Yet this is precisely what is sought here! There was much said in both the oral and in the printed arguments submitted herein as to the doctrine of relation quoad title to forfeited property. We do not understand that the counsel for plaintiff disputes the proposition, nor can it be successfully disputed that the title to forfeited property relates back to the time of the commission of the wrongful act; but there is no such

question whatever in this case. If the property concerned herein has been forfeited, the title of the City of New Orleans to it retracts back to the commission of the offense for which Doty et als. were convicted. *This may be admitted at once.* But the question here is, has the city any title at all—has the property ever been forfeited—and can there be any forfeiture which *divests* title from and *invests* title in the other, until the "forfeiture," in the language of Mr. Cooley( supra, "has been declared in due form?"

The city's contention is, that where the statute imposes forfeiture as the penalty, the *mere commission* of the wrongful act by an offending thing, or the *mere* convicion of a guilty person for crime *proprio vigore* operates a forfeiture and *invests* title so fully and completely in the person or municipality to whom or to which the forfeiture inures that he or it may maintain a separate civil action to obtain the *possession* of the thing thus forfeited; that therefore if the penalty of forfeiture is to be vested on the thing as an offending thing, without regard to the guilt or innocence of its owner, there need be no judgment of condemnation to change the title to the thing, and that if the penalty of forfeiture is imposed by the statute as a punishment for crime *in personam,* after conviction there need be no sentence imposing the forfeiture so as to divest from the one and invest in the other the title to the thing.

The books may be sought in vain for authority to support any such contention. On the contrary, the authorities are uniform and numerous the other way. From among a great number we may cite a few as follows:

In Fire Department of New York vs. Kip. 10 Wen. (N. Y.) 266, it was held that "where a statute imposes a forfeiture of goods and chattels by way of penalty, the title does not vest in the party to whom the goods and chattels are given, without a judicial proceeding *declaring the forfeiture to the party to whom they belong."*

In Gear vs. Butterdick, 34 Ill., 74, it was held that under a statute which imposes a forfeiture of any boat which shall be run as a ferry without authority shall be forfeited, the boat

could not be taken until the forfeiture had been judicially determined and declared.   So also is it the case with all forfeitures under the Custom, Internal Revenue, and Navigation laws of the United States.

In Henderson's Distilled Spirits, 14 Wall, 56, and Thacher vs. U. S., 103, U. S., 685, it was held: "Where a forfeiture of property for a violation of the revenue law is *made absolute* by statute, the decree of condemnation, *when entered,* relates back to the time of the commission of the wrongful act.   The effect of such wrongful act, when the forfeiture is made absolute by statute, is to vest title in the United States in case prosecution ensues and a decree of condemnation folows."

In Caldwell vs. U. S., 8 How. App. 381, the Court said: "The title to the United States is not consumated until after *judicial action,* but the right to them relates backwards to the time the offense was committed, so as to avoid all intermediate sales of them *between the commission of the offense and the condemnation.*   So this Court said in the United States vs. 1960 Bags Coffee, 8 Cranch, 398; it was again said in the case of the United States vs. Brig Mars, 8 Cranch, 41; declared again four years afterwards in Gibson vs. Hoyt, 3 Wheat 311. In the Mary Celeste, 2 Lowell (U. S.) 354—Lowell, J. said, delivering the opinion of the Court:   "It is true of all furfeitures that they must be completed by seizure and the other *requisite proceedings before the title will vest in possession."*

Burroughs, on Taxation, 579, referring to forfeitures under the laws of the United States, says:   "In case of a forfeiture the title of the United States is not complete until *judicial condemnation,* but it then reverts to the commission of the offense and avoids all intermediate sales between the commission and *condemnation,"* and he cites in support thereof U. S. vs. 1960 Bags Coffee, 8 Cranch 398; U. S. vs. Brig Mars, 8 Cranch 417; Gibson vs. Hoyt, 3 Wheat 311; U. S. vs. Grundy, 3 Cranch 337; and Caldwell vs. U. S., 8 How. 366.

The Am. and Eng. Enc. of Law, 2 Ed., verbis REVENUE LAWS, Vol. 24, pages 931 et seq, says that the forfeiture must be *judicially declared* and that it is only *then* that it relates back to

the commission of the offense, and takes precedence of any sale, seizure, or incumbrance thereafter. That it is the judgment which consummates and perfects the title, and that it is only after judgment that all intermediate sales or alienations are voided, —is affirmed in U. S. vs. Stowell, 133 U. S. 1; U. S. vs. One Copper Still, 8 Bliss 270; U. S. vs. Brig Neura, 19 How. 92; The Caledonian, 4 Wheat 100; The Thomas Gibbons, 8 Cranch 421.

"As said in U. S. vs. Fifty-six Barrels of Whisky, 1 Abb. (U. S.) 92, judgment "is the consummation of the proceedings that the law requires to be instituted *to ascertain the fact of forfeiture.*"

And in U. S. vs. Stowell, 133 U. S. 1, it is said that, though the forfeiture takes effect immediately upon the commission of the act, and the right to the property then vests in the United States—*"the title is not perfected until judicial condemnation;* the forfeiture constitutes a stationary transfer of the right to the U. S. at the time the offense is committed, and the *condemnation, when obtained,* .relates back to that time and avoids all intermediate sales, etc."

To the same effect is the Thos. Gibbons, 8 Cranch 421; The Mars, 1 Gallis 192; The Caledonian, 4 Wheat 100; Parker vs. U. S., 2 Wash. C. C. 361; U. S. vs. Grundy, 3 Cranch 338; U. S. vs. Brig Neura, 19 How. 92; U. S. vs. Rectified Spirits, 8 Black 480.

It is argued by the able counsel of the City, that a distinction is to be made between the proceedings for forfeiture under the custom and revenue laws of the United States and the act under consideration here, in that, that in the former case the general statutes of the United States directs that in all cases of forfeiture against an offending thing the proceedings shall be by *qui tam* or action in rem; whereas the act of 1870 provides no manner of enforcing the forfeiture; that the Statute is dumb as to whether the City or State shall proceed by information directed against the things themselves, with notice to those in interest,( as provided by the federal statutes; "and that the statutes does not say that the forfeiture of the things mentioned is an extra penalty

to be included in the judgment or sentence of the Court." Of course, we cannot understand this argument to mean that if the federal statutes did not provide this particular mode of procedure against an offending thing disconnected with any prosecution *in personam* no judicial proceeding would be required at all; that no forfeiture need be "declared in due form," and that by the mere fact that the thing has offended the law the title to the government in it would be perfect, and it might *vi et armis* take possession as owner of the offending thing. And yet this, it would seem, is the logic of the argument!

The purpose of the federal statutes in indicating the character of procedure is manifest, when we come to consider that under these federal laws separate sections cover *forfeitures* for the same offense, some necessarily requiring civil process for their enforcement and other criminal process. Certain sections provide for forfeiture against the offending thing, without regard to the guilt or innocence of the person; other sections impose forfeiture as a punishment on the guilty person on conviction for the same offense, when the statute provides for both forfeiture in rem and prosecution in personam. The government has the option to proceed either against the thing or against the person. If it elects to proceed against the thing, the action is *necessarily civil;* hence the statute, which directs that the proceeding in that case shall be by libel of information, the *qui tam* action does nothing more nor less than to indicate the particular, character or nature of the civil action to be instituted, as for instance, that it shall not be by an action for repleving, or for debt, or by any of the other forms of common law actions. When, however, the government elects to proceed against the guilty person, the proceeding is then to be by indictment and necessarily in the Court of criminal jurisdiction. The government, however, cannot have both actions. A judgment in either case is a bar to proceedings in the other.

In Boyd vs. U. S., 116 U. S., 616, the close relation between the two proceedings, civil and criminal, in cases under the custom laws, is shown. The case was an information filed by the District Attorney for the Southern District of New York in a

case of seizure and forfeiture against 35 cases of plate glass seized by the collector as forfeited to the United States under Sec. 12 of the Act. to amend the Custom Revenue Laws, and to repeal moreties, passed June 22, 1874, 18 Stat. 186, which provides as a penalty to any person violating the act "a fine not exceeding $5,000 nor less than $50 or to be imprisoned for any time not exceeding two years, and in addition to such fine such merchandise shall be forfeited." The Court said:

"(p 623-4) We are clearly of opinion that proceedings instituted for the purpose of declaring the forfeiture of a man's property by reason of offense committed by him, though they may be civil in form are in their nature criminal. In this very case the grounds of forfeiture are declared in the 12 Sec. of the Act. of 1874, on which the information is based, consists of certain acts of fraud committed against the public revenue in relation to imported merchandise, which are made criminal by the statues, and it is declared that the offender shall be fined not exceeding $5,000, nor less than $50, or to be imprisoned not exceeding two years or both, and in addition to such fine such merchandise shall be forfeited. *These are the penalties fixed by the criminal act; the forfeiture sought by this suit being one of them. If an indictment had been presented against the claimant, upon conviction, the forfeiture of the goods could have been included in the judgment. If the government prosecutor elects to waive* an indictment and to file a civil information against the claimants—this is civil in form—can he by this device take from the proceedings its criminal aspect or deprive the claimants of their immunities as citizens, and exert from them a production of their private papers or as an alternative a confession of guilt.—This cannot be. *The information, though technically a civil proceeding, is in substance and effect a criminal one.* As showing the close relation between the civil and criminal proceeding on this same statutes in such cases, we may refer to the case of Coffey vs. The U. S., in the 116 U. S. 436, in which we decided that an acquittal on a criminal prosecution was a good plea in bar to a civil information for the forfeiture of goods arising under the same."

In the U. S. vs. Wm. McKee, 4 Dillon 128, a civil action was instituted by the U. S. against McKee, based upon Sec. 3296 of the Rev. Stat. of the U. S. to recover the penalty of double the amount of tax on distilled spirits which the government alleged was forfeited to it by reason of the unlawful removal of the spirits without payment of the taxes. To this the defendant pleaded that he had been indicted in this Court and *convicted* and *punished* for the same offense, and the plea set forth the substance of the indictment and the judgment of the Court by which he was sentenced to pay a fine of $1000 and to imprisonment in the county jail for two years. Miller, Circuit Judge, with whom sat and concurred in the opinion Dillon, D. J., said that "as the two allegations were but one the suit for the penalty was barred by the judgment in the Criminal case, The decision was put on the ground that the defendant would not be twice *punished* for the same crime, and that the former conviction and judgment were a bar to the suit for the penalty. This case is cited and approved in Coffee vs. U. S., 116 U. S. 436.

To the argument, that the act of 1870 "does not say that the forfeiture is an extra punishment to be included in the judgment or sentence" it is sufficient to say that if the act of 1870 is a criminal statute then it follows as a legal conseqence that the fine and the imprisonment and the forfeiture imposed therein on conviction are but the several punishments for the crime denounced, either one of which punishments, to be effective, must necessarily be included in the sentence.

To the suggestion that. "the act is dumb as to whether the City shall proceed by information directed against the things themselves," we answer first, that the Constitution directs how penalties in a criminal statute may be inflicted *id est, by* criminal prosecutions instituted by indictment or information, or as provided by legislative provisions, by affidavits for the prosecution of misdemeanors, Con. Art. 9; second, that it is a well settled proposition of law that all fines and forfeitures imposed by a criminal statutes as a punishment for crimes and misdemeanors must be adjudged and enforced by a criminal process *"unless a*

*different mode of procedure be expressly provided for."* This question is fully discussed in State vs. Williams, R. 252; third, the act itself declares that the trial shall be "only by the Court of criminal jurisdiction, Sec. 6; and fourth, Sec. 986, Rev. Statutes clearly indicates that the infliction of a forfeiture as a punishment for personal crime and offenses must be imposed in a criminal proceeding, for as much as this section, in providing the prescriptive period for the imposition of forfeiture, refers to the action to be brought for the purpose of imposing same as a "prosecution." This section reads, *inter alia,* as follows: " * * * * * * nor shall any person be *prosecuted* for any fine or *forfeiture* under any law of this State, unless the prosecution for the same shall be instituted within six months of the time of incurring such fine or forfeiture."

The word prosecution denotes a criminal proceeding:

Markham vs. Cole, 2 La., 585; State vs. Williams, 7. R. 252;

State vs. Monastero, 4 A. 380; State vs. White, 13 A. 573.

The act of 1870 being clearly a criminal statute, and the forfeiture therein provided being in the nature of a fine and assuredly a punishment to be inflicted upon conviction of the person, it follows that unless the Court before which the trial is had has declared the consequences to the convict of the fact of his guilt, those consequences do not exist. As a consequence of a conviction under the act the Court might impose on the convicted person a fine, an imprisonment, a forfeiture, or all of these punishments, but if it omits any one of them in the sentence, the one omitted cannot be enforced by any manner of proceedings, and certainly not by a civil proceeding.

In the case of the conviction of Doty et. als. the criminal Court did not impose a forfeiture, hence no forfeiture exists, and the city is therefore without any title whatsoever to the property seized herein.

As already stated, the City's contention is not that its instant opposition may be likened to a civil proceeding to obtain judgment of condemnation, but its position is that no judicial pro-

nouncement of forfeiture is at all necessary in either a civil or criminal proceeding. It insists that the act of 1870 operates the forfeiture *suo motu,* and that its title to the money vested completely and fully by the mere fact of forfeiture. But, even if it should be contended that a civil proceeding might lie to enforce the forfeiture, under the act of 1870, supra, and that the instant proceedings might be regarded as a proceeding looking to the condemnation of the property involved herein, the question would at once suggest itself, what is it that the act declares forfeited and against what property is it that the judgment of condemnation is to operate. Forfeiture, it must not be forgotten, is not favored in the law. All statutes imposing same are to be strictly construed and most favorably to those against whom the forfeiture is directed. So also must all proceedings directed by the statute for enforcing a forfeiture be strictly followed.

Clark vs. Strickland, 2 Curtis (U. S.) 437.

The section of the act of 1870 which refers to the forfeiture is, as shown, section 4. That section does not, nor does any other section of the act, provide that all the tables, money or representatives of money, implements and other paraphernalia which may be used in keeping a banking game shall, on conviction be forfeited. It is not within the letter, nor indeed within the spirit of the act, that this consequence should follow the mere existence of these things. The act is specific to the effect that it is only the tables, money, or representatives of money, implements and other paraphernalia which were *used in the game* for the keeping of which the offenders were convicted; and *only such, when used in the game, as were seized by the police, taken before a committing magistrate, inventoried by the latter, and by the committing magistrate sent up, after such inventory, to the trial Court.*

This section, after providing for the arrest of the "person * * * * * together with all the tables, money, etc., etc.," directs that they shall "take or cause them to be taken before any committing magistrate, who shall commit such person for trial if upon hearing there be sufficient cause therefor;" then it adds,

"it shall be the duty of the officers committing such offenders to take an inventory of all money or its representatives, tables or other implements *or paraphernalia that may be seized and brought before him, all of which shall on conviction be forfeited for the use of the parish in which the offense is committed.*"

"*All of which shall on conviction be forfeited.*" All of what shall be forfeited? Clearly, all that may be *seized,* if the things seized be shown to have been used in the game. In the instant case it was shown, on the trial of these oppositions, that tables and "chips" and other paraphernalia in addition to the money in question were all used in "keeping such banking house" and in "playing such banking game" on the 18 July, 1903. None of these things, the money in question included, was ever in the custody of the Criminal Court by seizure or by any other process. The clerk of that Court, as we have shown, held the money simply as the custodian of a thing offered and filed in evidence in the trial of a cause before the Court in which he officiates. Is it within the letter or the spirit of the act of 1870 that notwithstanding these facts the money, the "chips" and the other "implements and paraphernalia" are all "forfeited," and that months after the conviction and sentence an action, conceding for the argument, that a civil action may lie, would lie for the money; then still later on another action may be brought for the "chips," and later still another for the faro table, and so on from time to time for each separate "implement or other paraphernalia?" We think not. Seizure, in cases of this character is, in our opinion, a jurisdictional fact necessary to give the Court, whether the proceedings be criminal or civil, cognizance of the crime so as to authorize a judgment of forfeiture. It may not be doubted that a judgment or sentence announced in the language of the statute applicable to the cause determined, not only answers the law, but is, or ought to be, the only proper form of judgment to be rendered or sentence to be pronounced.

In declaring a forfeiture under the act in question, whether the judicial declaration be made by sentence in a criminal proceeding or by judgment in a civil proceeding, would not the prop-

219

er form be to declare "that all the property seized herein and duly inventoried be and the same is hereby declared forfeited?" If that be the proper form, and we are of opinion that it is, does it not demonstrate that it is then only such of the things described in the act of 1870, as may be in the custody of the Court *under seizure* that can be made the subject of the forfeiture? We think so.

Seizure under the Custom, Internal Revenue and Navigation laws of the United States is held to be a jurisdictional fact necessary to give the Court cognizance of the cause.

In the Brig. Ann., 9, Cranch 289, it is held that "In order to institute a perfect proceeding in rem it is necessary that the thing shall be actually or constructively within the reach of the Court.

It is actually within its possession when it is submitted to the process of the Court; it is constructively so when by seizure it is held to ascertain and enforce a right of forfeiture which can alone be done by a judicial decree in rem * * * * It follows from this consideration, that before judicial cognizance can attach upon a forfeiture in rem under the statute *there must be a seizure,* for until seizure it is impossible to ascertain what is the competent form; and if so it must be a good subsisting seizure at the time when the libel or information is filed."

To the same effect is The Washington, 4 Black (U. S.) 101; The Kate Heron, Fed Cases, No. 761 (6 Story 106); U. S. vs. 100 Barrels of Spirits, Federal Cases 15, 949 (2 Abbot 305), and the cases cited supra on the first branch of this case, more the Federal Reporters and United States Supreme Court Reports.

Viewing the case from every standpoint, we cannot see how the City can maintain its claim to title to this money. To the extent therefore, that the judgment maintains the opposition of the City, it is error; in other respects it is not error.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and the same is hereby amended by striking out therefrom so much thereof as maintains the opposition of the City of New Orleans and declares the said city to

be the owner of the sum of Eight Hundred and Twenty-five Dollars, now in the hands of the civil sheriff of the Parish of Orleans and held by him under act of fi. fa. issued herein; the opposition of the said city being now and hereby rejected, and the city is declared hereby not to be the owner of said fund; and as thus amended the judgment is affirmed.

The costs of this Court, as well as those of the Court below, to be taxed against the City of New Orleans and the said Isidore Busha.

Feb. 19, 1906.

## DISSENTING OPINION.

1. When the Sheriff is in possession of property by virtue of a seizure under execution, he must be considered as a rightful possessor holding for the benefit of the plaintiff in writ, until and unless a third person opposing the execution clearly shows that he owns or has a privilege on the property seized.

2. When a statute in terms denounces a forfeiture of property as the penalty for a violation of law, without alternative of value, or other qualifications or provisions, or language showing a different intent, such a forfeiture takes place absolutely and instantaneously on the commission of the offense, at such other time and upon such other conditions or occurrences as the statute may name.

3. In cases of construction of statutes for forfeiture, the rules of the common law are dispensed with, and the will of the legislature alone need be ascertained by judicial interpretation of the statute.

4. Act 12 of 1870 provides that all moneys, etc., that may be seized and brought before the municipal police and that may have been used in keeping a banking house or playing a banking game, shall on conviction of the offending parties, be forfeited for the use of the parish in which the offense is committed.

5. There is, in that statute, no alternative, no condition, no language susceptible of any construction other than that the property vests in the City as the direct and immediate result of conviction, There is no condemnation of the property required, and no obligation to include a decree of forfeiture in the sentence imposed upon the convicted offender.

6. The issue presented is one of ownership of money in the hands of the Civil Sheriff, and the effect on property of a criminal statute is a collateral matter and a mere incident which the Civil Courts may deal with in pronouncing upon the question of ownership.

7. The mere fact that a matter is connected with a criminal pro-

ceeding is not the test of jurisdiction, which is conferred by the Constitution and the law.

8. The money used in the banking game was brought before the public officers, the parties running the banking game at the time were convicted, and forfeiture followed under the statute without further proceedings. The City, as beneficiary, is entitled to the fund.

DUFOUR, J. The plaintiff, a judgment creditor of Arthur Behan and one Duffy, sued for garnishment process against the Clerk of the Criminal Court, and by order of the Civil District Court acquiesced in by the Criminal District Court, the sum of $825, was transferred to the custody of the Civil Sheriff, subject to such claims of ownership as might be asserted by the possible parties in interest.

This fund found its way into the hands of the police authorities as the result of a raid made on a gambling house, and it was turned over to the Criminal Court to be used as evidence in the prosecution of certain parties who had been charged with keeping, and aiding or assisting in keeping a banking game.

Three parties now claim this fund.

First. The seizing creditor who asserts that his seizure must stand unless some claimant establishes his title to the property seized.

Second. One Busha, who claims that the money belongs to him, and had been by him entrusted to Richard Behan for safe keeping.

Third. The City of New Orleans, which asserts title on the ground that, under Act No. 12 of 1870, upon the conviction which was had of the parties accused of violating that statute, the money was *ipso facto* forfeited to the City.

The two claimants last named object that the fund seized does not belong to the plaintiff's judgment debtor, and that its seizure is therefore without legal effect.

Considering that, under a writ of *fieri facias* with cumulative garnishment directed to the Clerk of the Criminal Court and the judicial order thereon rendered, the money was turned over to the Civil Sheriff and further considering that opponents are now asserting their rights to the same, they cannot be heard

to say that there was no seizure in point either of law or of fact. If the property in dispute belongs to them, proof of ownership will restore it to them; if it be not theirs, they are without interest to question the seizure or to inquire whether or not the property belongs to the Judgment debtor. Their sole right is to attack the seizure as illegal, if it be levied on their property to satisfy another's judgment debt.

8 M. S. 661,-1 R. 41,-15 An. 136.

2

Busha's claim of ownership is not born out by evidence of a convincing nature.  . . . .

He testifies that he frequently entrusted money to Behan for safe keeping, and that he gave the money now in controversy to Behan to keep in his safe, between 2 and 3 o'clock on the morning of July 18th, 1903.  He adds that he does not *know* that the money seized is the same that he gave to Behan.

Behan testifies that on July 18th, 1903, he put in his safe $825, handed him by Busha; he had been drinking for a week, and yet he says that, although he did not count the money, he *knew* it amounted to $825.  He admits that, through his attorney, acting under his instructions, a demand for the money was made on the district attorney, in his own name, and in his own behalf. He refused to say any one else knew the combination of his safe, and a considerable portion of his testimony consists of refusals to answer questions on the ground that he might incriminate himself.

Further, he alternately swears that he did not turn over the money to any one, that he did not know if any one else knew the safe combination, but, *he thinks*" that the money "left his safe" on the morning of the 18th.

. . If neither Behan, nor any one else knowing the combination, removed the money from the safe, it should still be there, as there is not a particle of proof in the record to show that it ever found its way to the gambling drawer.

I have, after a careful examination of the testimony, reached the conclusion that Basha's claim is the result of a clumsy collusive attempt to secure the fund and that the amount fixed upon

by Behan and himself as the proper and precise sum to claim was based upon their ascertainment of the amount in the hands of the authorities.

## 3.

Act No. 12 of 1870 upon which the City rests its claim reads as follows:

> Sec. 4.   Be it further enacted, etc.,   That it shall be the duty of the superintendents, and other officers of police, or any public officer, to arrest and take into custody any person keeping any banking game, or aiding or assisting in keeping the same, together with all the tables, money, or representatives of money, implements, and other paraphernalia which may be used in keeping such banking houses, or in playing such banking game, and take; or cause them to be taken, before any committing magistrate, who shall commit such persons for trial, if, upon a hearing, there be sufficient cause thereof.   It shall be the duty of the officers committing such offenders, to take an inventory of all money, or its representatives, tables or other implements or paraphernalia that may be seized and brought before him, all of which shall, on conviction, be forfeited for the use of the parish in which the offense is committed."
> P. 38.

The objection urged by the seizing creditor to the City's claim is that this statute "is a penal statute and the penalty of forfeiture can only be imposed after conviction and is part of the sentence, and not having been imposed by the Court which tried the case and which alone had jurisdiction, cannot be enforced in a civil suit."

The objection of Busha's counsel is that "under the statute of 1870, the City is only beneficiary when there has been a forfeiture, that the preliminary act involves the seizure by an officer of the government, that the judgment should be one not only of conviction against the party charged with violating the law, but the fund itself, the thing itself, should be by the decree condemned, and that it does not lie within the power of the City of New Orleans to have a forfeiture decreed, and it is not with-

in the jurisdiction of Civil Courts to decree a forfeiture for a criminal offence."

The question presented is a new one in this State, but it has been considered in other jurisdictions notably by the Supreme Court of the United States in matters arising under the federal revenue laws.

An able text writer epitomizes the law on this subject as follows:

"Property is often forfeited by illegal acts. This sometimes results from the rules of the common law, and sometimes from the provisions of statutes. But there is a marked difference in the two cases. A forfeiture at common law does not operate to change the property until some legal step has been taken by the government for the assertion of its rights; but where a forfeiture is given by statute, the rules of the common law are dispensed with, and the thing forfeited may either vest immediately or upon the performance of some future act, according to the will of the Legislature; and if no future time or future act is pointed out, then where, by the words of a statute, a forfeiture is attached to the commission of an offense, its immediate operation is to divest wholly the title of the owner, so as to deprive him of the right of maintaining any action or defense to which, as owner, he would otherwise be entitled. So, where the English navigation act had been violated, it was held that the forfeiture, though there had been no previous condemnation. So, where an act of the Congress of the United States, declaring that whatever certain articles' should be imported into the United States after the 20th day of May next, all such articles shall be forfeited to the United States, "it was held that an absolute and instantaneous forfeiture was created by the mere act of importation, that no seizure was necessary to vest the title in the government, and that even a bona fide purchaser acquired no title. So, again, where a statute in New York, in relation to lotteries, provided that "all properties offered for sale, distribution, or disposition against the provision of law shall be forfeited to the people of the State, it was held that the mere offer for

225

sale worked an immediate change and transfer of the title."
(Italics ours.)

In the Am's Eng. Encyc. of Law, vol. 13, p. p . 58 and 59, is found the folowing text based on decisions cited in the notes:

> "While a forfeiture at common law does not operate to divest the title of the owner until by a proper judgment is a suit instituted for that purpose the rights of the State have been established, it is otherwise where a statute in terms denounces a forfeiture of property as the penalty for a violation of law, without alternative of value, or other qualifications or provisions, or language showing a different intent; for in such case the forfeiture takes place absolutely and instantaneously on the commission of the offense, or at such time and upon such conditions as the statute may name." (Italics ours.)

In a case which arose under an act declaring that *"there shall be a forfeiture* of the ship" for false swearing on the part of certain parties, Chief Justice Marshall said "that where a forfeiture is given by a statute, the rules of the common law may be dispensed with, and the thing forfeited may either vest immediately, or on the performance of some particular act, as shall be the will of the legislature.   This must depend upon the construction of the statute."

U. S. vs. Gunly, 3 Cranch 336, 348, in U. S. vs. 1960 Bags of Coffee, the statute under consideration declared "that whenever any articles the importation of which is prohibited by this act, shall be imported into the United States, all such articles *shall be forfeited."*

The views of the Court were thus stated:

"We are of opinion that the question rests altogether on the wording of the Act of Congress by which it is expressly declared that the forfeiture shall take place upon the commission of the offense.   If the phraseology were such as in the opinion of the majority of the Court, to admit of doubt it would then be proper to resort to analogy and the doctrine of forfeit-

226

ure at common law, to assist the mind in coming to a conclusion.

But all assistance derivable from that quarter becomes unnecessary."

8 Cranch.

In U. S. vs. Stewell, 133 Rp. S. 1, 16, 17, in which all the entire cases are referred to, the following language was used:

"By the settled doctrine of this Court whenever a statute enacts that upon the commission of a certain act, specific property used in or connected with that act shall be forfeited, the forfeiture takes effect immediately upon the commission of the act; the right to the property then vests in the United States, although their title is not perfected until judicial condemnation; the forfeiture constitutes a statutory transfer of the right to the United States at the time the offense is committed; and the condemnation, when obtained, relates back to that time, and avoids all intermediate sales and alienations, even to purchase in good faith."

In order to fully understand the distinction to be made in this matter, it must be borne in mind that the federal statutes establish a mode of procedure to perfect the title by condemnation. The offending thing declared by statute to be forfeited is tried and condemned, and the effect of the sentence relates to the time of the commission of the offense.

Thus, Section 3458, 3459 and 3453 U. S. R. S. provides for proceedings *in rem* to enforce forfeiture of things "which shall be forfeited," under the revenue laws, and Section 3332 also provides for a judgment of forfeiture. Section 4305 provides that forfeitures incurred for offenses against the Navigation laws are to be sued for in the Courts of the United States.

In examining the Louisiana statute I do not find any special mode of procedure ordained in order to perfect the title to the thing forfeited. The Legislature, as it had the right to do, has declared that, upon conviction of the offenders, the property seized shall be forfeited for the use, of the parish. There is no alternative, no condition, no language susceptible of any con-

struction other than that the property vests in the City as the direct and immediate result of conviction.

No condemnation is required, and there is nothing in the law which, directly or indirectly intimates that there is no legal forfeiture, unless the sentence imposed on the offender also includes a decree of forfeiture of the property seized.

I see no reason why the city could not have claimed the money immediately upon the affirmance of the sentence by the Supreme Court and its present proceedings is cognizable by a Civil Court, because the only issue presented is that of ownership. The interpretation of a criminal statute is in this instance a collateral matter and a mere incident which the Civil Court may deal with in pronouncing upon the question of ownership, I know of no law which confers upon the Criminal Court jurisdiction of any cause for the collection of money or for the recovery of property in a case of this nature, and *but for special legislation,* that Court could not render judgment on bail bonds.

I may by way of analogy, refer to the decision "that a bail bond for the appearance of an accused at a preliminary examination before a recorder of the Parish of Orleans creates a lawful and binding obligation and such a bail bond may be sued upon by a Civil action, in the Civil District Court for the Parish of Orleans."

The mere fact that a matter is connected with a criminal proceeding is not the text of jurisdiction; the Constitution and Statutes confer it.

If the foregoing views be correct, the plea of prescription of six months necessarily falls.

The money used in the banking game was brought before the public officers and kept by them, the parties running the game at the time were convicted, and forfeiture followed under the statute, without further proceedings. The City, as beneficiary is entitled to the fund. I think the Judgment should be affirmed, and therefore dissent.

Feby. 19th, 1906.

228

# APPLICATION FOR REHEARING.

1. A petition for rehearing, which does not set forth the grounds on which the complainant charges the judgment is erroneous, does not comply with the law and will not be entertained by the Court.

2. Though, at times, appellate Courts have countenanced petitions not presented in compliance with the mandatory requirements of the law, where the party in adverse interest has made no objection, yet, the law must be enforced in any case when the Court is asked either by motion to dismiss or by rule to declare the judgment final, to reject the petition for rehearing.

DUFOUR, J. The City of New Orleans has presented an application for a rehearing couched in the folowing language:

"That the opinion and decree rendered in this cause on the 19th day, of February, 1906, is erroneous and contrary to the law and evidence and prejudicial to the interest of petitioner and that a rehearing should be granted in this matter?"

Armbuster thereupon moved to dismiss the application on the grounds:

First. That the so-called petition for rehearing is not such a petition as is required by law and presents nothing upon which this Court can act."

Second. That the City of New Orleans has acquiesed in the judgment of this Court by proceedings taken by it in the Criminal Court by proceedings taken by it in the Criminal District Court on March 1st, 1906, a duly certified copy of same being hereto annexed as part herein."

Article 912 of the Code of Practice is as follows:

"In the interval between the day upon which the judgment is rendered and that on which it becomes final, a party dissatisfied with the judgment may apply to the Court for a new hearing in the cause; and for this purpose shall present a petition, in which he shall state substantially the reasons for which he thinks the judgment erroneous, and shall cite authorities in support of his opinion."

Rule 10 of this Court is substantially like the corresponding one of the Supreme Court, and is thus stated:

"Applications for rehearing must be by petition filed within

six judicial days after the rendition of the decree which delay may be extended upon proper showing, and must be accompanied or followed (where delay has been granted) by three copies of a printed or written statement of all the points and authorities on which the party founds his application."

In this instance no special reasons are assigned to show error in the decree, and no delay was asked for to furnish points or authorities in support of the application.

In Lacroix vs. Camors, 34 An. 639, the petition for rehearing alleged *error* in the judgment, and on motion a delay of fifteen days was granted to file a brief in support of the complaint.

The Court, after citing 30 An. 190,-30, An. 1349-34, A. 379, 380, said:

"The Code of Practice and the rule both unequivocally and positively require that the application for rehearing must disclose the reasons for which the judgment is charged to be erroneous. In the exercise of its discretion the Court has provided for a delay to allow the party complaining to elaborate his points, upon which the Code is silent. But under either proceedings, the application must contain the grounds on which the judgment is assailed.

It is therefore clear that an aplication for rehearing which complies neither with the Code nor with the rule of Court, is fatally defective and cannot retard the operation of the law under which the judgment becomes final.

The application in this case, complying with neither, cannot be entertained by this Court."

The first ground of dismissal being founded, we need not inquire into the second.

The motion to dismiss the application must prevail.

It is therefore ordered that the application for rehearing herein presented be dismissed.